# EXHIBIT A

# Supreme Court of Pennsylvania

## Court of Common Pleas
## Civil Cover Sheet

LACKAWANNA _____ County

**For Prothonotary Use Only:**

MADDEN KELLY
LACKAWANNA COUNTY
2017 AUG -8 P 12:38
JUDICIAL RECORDS
CIVIL DIVISION

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

| | |
|---|---|
| **Commencement of Action:** | |
| ☒ Complaint    ☐ Writ of Summons | ☐ Petition |
| ☐ Transfer from Another Jurisdiction | ☐ Declaration of Taking |

| Lead Plaintiff's Name: | Lead Defendant's Name: |
|---|---|
| SIGNATURE BUILDING SYSTEMS, INC., | SPEARS MANU., & PARTNERS 3190, LLC |

| | | |
|---|---|---|
| **Are money damages requested?** ☐ Yes   ☐ No | Dollar Amount Requested: (check one) | ☐ within arbitration limits ☐ outside arbitration limits |

| | |
|---|---|
| **Is this a *Class Action Suit*?**   ☐ Yes   ☐ No | **Is this an *MDJ Appeal*?**   ☐ Yes   ☐ No |

Name of Plaintiff/Appellant's Attorney: Michael R. Mey, Esquire

☐ Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)

**Nature of the Case:**   Place an "X" to the left of the **ONE** case category that most accurately describes your ***PRIMARY CASE**. If you are making more than one type of claim, check the one that you consider most important.*

**TORT** *(do not include Mass Tort)*
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability *(does not include mass tort)*
- ☐ Slander/Libel/ Defamation
- ☐ Other: _____

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other: _____

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional: _____

**CONTRACT** *(do not include Judgments)*
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other

- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other

- ☐ Other: _____

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other: _____

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other

- ☐ Zoning Board
- ☐ Other: _____

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other: _____

Michael R. Mey, Esquire
MEY & SULLA, L.L.P.
1144 East Drinker Street
Dunmore, PA 18512
Phone - 570-961-1929
ID# 41441

---

| SIGNATURE BUILDING SYSTEMS, INC., | : | IN THE COURT OF COMMON PLEAS |
|---|---|---|
|    1004 Springbrook Avenue | : | OF LACKAWANNA COUNTY |

SIGNATURE BUILDING SYSTEMS,
INC.,
   1004 Springbrook Avenue
   Moosic, PA  18507

         Plaintiff

   vs.

SPEARS MANUFACTURING CO.,
   15853 Olden Street
   Sylmar, CA 91342
         Defendant
and

PARTNERS 3190 LLC., and
WASHINGTON JP
CONSTRUCTION, LLC.,
   709 Center Street

          IN THE COURT OF COMMON PLEAS
          OF LACKAWANNA COUNTY

          CIVIL ACTION - LAW

: NO.:

17CC
4313

CLERK OF
JUDICIAL RECORDS
CIVIL DIVISION
2017 AUG - 8   P 12: 40
MAURI B. KELLY
LACKAWANNA COUNTY

## NOTICE TO PLEAD

<table>
<tr><th>NOTICE</th><th>AVISO</th></tr>
<tr>
<td>

YOU HAVE BEEN SUED IN COURT. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint is served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so, the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the Complaint or any other claim or relief requested by the Plaintiffs.  You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

</td>
<td>

USTED HA SIDO DEMANDADO/A EN CORTE. Si usted desea defenderse de las demandas que se presentan más adelante en las siguientes páginas, debe tomar acción dentro de los próximos veinte (20) días después de la notificación de esta Demanda y Aviso radicando personalmente o por medio de un abogado una comparecencia escrita y radicando en la Corte por escrito sus defensas de, y objecciones a, las demandas presentadas aquí en contra suya. Se le advierte de que si usted falla de tomar acción como se describe anteriormente, el caso puede proceder sin usted y un fallo por cualquier suma de dinero reclamada en la demanda o cualquier otra reclamación o remedio solicitado por el demandante puede ser dictado en contra suya por la Corte sin más aviso adicional. Usted puede perder dinero o propiedad u otros derechos importantes para usted.

USTED DEBE LLEVAR ESTE DOCUMENTO A SU ABOGADO INMEDIATAMENTE SI USTED NO TIENE UN ABOGADO, LLAME O VAYA A LA SIGUIENTE OFICINA. ESTA OFICINA PUEDE PROVEERLE INFORMACION A CERCA DE COMO CONSEGUIR UN ABOGADO. SI USTED NO PUEDE PAGAR POR LOS SERVICIOS DE UN ABOGADO, ES POSIBLE QUE ESTA OFICINA LE PUEDA PROVEER INFORMACION SOBRE AGENCIAS QUE OFREZCAN SERVICIOS LEGALES SIN CARGO O BAJO COSTO A PERSONAS QUE CUALIFICAN.

</td>
</tr>
</table>

Northern PA Legal Services
33 North Main Street, Suite 200
Pittston, PA 18640
855-236-6405
*Fax: 570-824-0001*

PA Lawyer Referral Service
P. O. Box 1086
100 South Street
Harrisburg, PA 17108
*PA Residents 1-800-692-7375*
*Out-of-State 717-238-6715*

Michael R. Mey, Esquire
MEY & SULLA, L.L.P.
1144 East Drinker Street
Dunmore, PA 18512
Phone - 570-961-1929
ID# 41441

| | |
|---|---|
| SIGNATURE BUILDING SYSTEMS, INC.,<br>   1004 Springbrook Avenue<br>   Moosic, PA   18507 | IN THE COURT OF COMMON PLEAS OF LACKAWANNA COUNTY |
|                      Plaintiff | |
|        vs. | CIVIL ACTION - LAW |
| SPEARS MANUFACTURING CO.,<br>   15853 Olden Street<br>   Sylmar, CA 91342<br>                      Defendant<br>and | |
| PARTNERS 3190 LLC.,<br>and WASHINGTON JP<br>CONSTRUCTION, LLC.,<br>   709 Center Street<br>   Suite 202<br>   Jamaica Plain, MA 02130<br>                      Defendants | NO.:   4313 |

## COMPLAINT FOR DECLARATORY RELIEF

**AND NOW** comes the Plaintiff,  SIGNATURE BUILDING SYSTEMS, INC., by and through its counsel, Mey & Sulla, LLP, and complains of the Defendant, Spears Manufacturing Company seeking a declaration of its rights as follows:

1.     Plaintiff, Signature Building Systems, (hereinafter "Signature") is a Pennsylvania business corporation with its only office and principal place of business located at 1004 Springbrook Avenue, Moosic, Lackawanna County, Pennsylvania.

2.     Defendant, Spears Manufacturing Company, (hereinafter "Spears") is a fictitious business entity which maintains a place of business located at 15853 Olden Street, Sylmar, California 91342.

3.     The Defendants Partners 3190, LLC, and Washington JP Construction, LLC,

is a fictitious business entity which maintains a place of business located at 709 Center Street, Suite 202, Jamaica Plain, Massachusetts 02130

4.      Between 2015 and 2017 Signature purchased CPVC (Polyvinyl Chloride) pipe manufactured by Spears for use in sprinkler systems for modular units constructed in its factory in Moosic, Pennsylvania.

5.      Upon information and belief Spears offers a "limited lifetime warranty" for the piping it manufactures in a form substantially as follows:

6.      A true and correct copy of the printed form of the warranty is attached as **Exhibit 1** hereto.

7.      During the month of October, 2015, Spears had certain of its personnel conduct training for Signature's employees at its factory in Moosic during which time various instructions and information was provided to Signature employees regarding the use of Spears piping in sprinkler systems installed at Signature's factory.

8.      At no time during this presentation did Spears employees caution Signature against the use of Propylene Glycol as an "antifreeze" in its piping system but instead made an inspection of all chemicals and agents utilized by Signature during the construction and testing of sprinkler systems which include the use of Propylene Glycol.

9.      In April 2017 Signature was notified by Defendants Partners 3190 LLC, Washington JP Construction, LLC the purchaser of certain modular units which incorporated Spears piping in their sprinkler systems that an onsite Fire Suppressant Technician had located Propylene Glycol in the sprinkler system and claimed that the same could compromise the structural integrity of the CPVC pipe.

10.     Between March 2017 and April 26, 2017 Signature engaged in a series of emails with Spears which included a request to honor the warranty based upon the training which had been provided by Spears to Signature.

2

11.     As a result of this controversy Signature had tested a portion of the CPVC pipe at issue by Plastic Expert Group and Plastic Failure Laboratories who performed tests including F.T.I.R. and determined that the Propylene Glycol had no effect upon the structural integrity of the CPVC pipe. A true and copy is attached as **Exhibit 2**.

12.     Defendant Spears has provided what it purports to be a copy of their warranty which is attached as **Exhibit 3**.

13.     Attached as **Exhibit 4** is the Contract between Signature and Partners 3190 LLC, and Washington JP Construction, LLC.

14.     Partners 3190 LLC and Washington JP Construction, LLC have demanded Arbitration before the American Arbitration Association.

15.     Prior to submitting this matter to Arbitration, counsel for Partners had written a letter to Signature on April 25th in which refers to that Contract as follows :

> *"Please also allow this to stand as Notice*
>
> *I) pursuant to Section 11 of the Contract that all 21 Units are rejected*
>
> *as defective and*
>
> *ii) of a breach of warranty pursuant to Section 16 of the Contract."*

A true and correct copy of that letter is attached as **Exhibit 5**.

16.     Paragraph 16 of the Contract states the following with respect to warranty claims:

> 16. WARRANTY CLAIMS. In the event that, during the Warranty Period, Buyer shall discover the existence of Defective Work, Buyer shall provide Manufacturer written notice of such Defective Work to Signature prior to the termination of the Warranty Period. Within ten (10) days after receipt of the Warranty Claim, Signature will notify Buyer of Its acceptance or denial of all or any part of the Warranty Claim, subject, however, to the following criteria:

> **e. Any dispute regarding the warranty shall be resolved by PFS, and their decision shall be binding and conclusive on both parties.**

17.  On May 19, 2017 counsel for Signature sent to counsel for Partners a letter requesting that he voluntarily withdraw this matter from Arbitration and submit the same in accordance with the agreement between the parties to the third party engineering inspector, PFS, for their determination. **Exhibit 6**. As of the preparation of this objection, no response has been made by Partners 3190.

18.  The nature, extent and methodology for resolution of warranty claims are all valuable, bargained for terms in the contract between the parties and reflect the desire to have a professional inspection and licensing  firm evaluate and resolve those claims with finality.

19.  Signature Building Systems, LLC does not and will not waive this important contractual provision which is part of the benefit of the bargain of the contract negotiated between the parties.

20.     The American Arbitration Association, rather than enforcing the aforesaid provision has made the administrative decision to refer the Arbitrability of the warranty clause to an assigned arbitrator rather than declining to proceed with arbitration despite the plain meaning of the contract between the parties.

21.     Counsel for Partners 3190 LLC, and Washington JP Construction, LLC has advised that they intend to remove, in whole or in part the sprinkler system in question on or about the 19th of July 2017.

**WHEREFORE**, the Plaintiff, Signature, respectfully requests this Honorable Court to grant the following Declaratory Relief:

1.     That Signature is entitled to the full benefit of the limited lifetime warranty

offered by Spears;

2.      That Spears neither expressly nor implicitly prohibited the use of Propylene Glycol to provide freeze protection in its CPVC pipe.

3.      That the warranty claim made by Partners 3190 LLC., and Washington JP Construction, LLC falls squarely within the warranty provision of the contract between the parties requiring the same to be resolved by PFS and any other relief the Court deems just and proper.

Respectfully submitted,

Michael R. Mey, Esquire

## **VERIFICATION**

I, Victor DePhillips, says that he is the President of Signature Building Systems, Inc., the Plaintiff in the foregoing action; that the attached Complaint for Declaratory Relief are based upon information which he has furnished to counsel and information which has been gathered by counsel in the preparation of the defense of this lawsuit. The language of the Complaint for Declaratory Relief is that of counsel and not of the Plaintiff. The Plaintiff has read the Complaint for Declaratory Relief and to the extent that they are based upon information which he has given to counsel, it is true and correct to the best of his knowledge, information and belief. To the extent that the content of the Complaint for Declaratory Relief is that of counsel, he has relied upon counsel in making this verification. Plaintiff understands that the statements are made subject to 18 Pa. C.S. §4904 providing for criminal penalties for unsworn falsification to authorities.

Date:

**VICTOR DePHILLIPS**
**SIGNATURE BUILDING SYSTEMS, INC.,**

# EXHIBIT "1"

## FlameGuard® LIMITED LIFETIME WARRANTY

Except as otherwise specified for certain products, mandated by law or herein provided, Spears® Manufacturing Company ("Company") warrants Standard Catalog Products ("Products") which have been directly manufactured by them to be free from defects in material and workmanship for as long as the original intended end user of the Products ("End User") retains ownership and possession of the Products and complies with this Warranty ("Warranty Period"). Each other person or entity acquiring or employing the Products, including buyers, contractors and installers ("Buyer") and End Users ("Buyer/End User") agrees that this Warranty shall be effective only during the Warranty Period so long as the Products are used solely for the normal purposes for which they are intended and in conformance with industry established standards, engineering, installation, operating, and maintenance specifications, recommendations and instructions including explicit instructions by the Company; the Products are properly installed, operated and used, and have not been modified; and all the other terms of this Warranty are complied with. Any violation thereof shall void this Warranty and relieve Company from all obligations arising from this Warranty and the Products.

Upon receipt or discovery of any Products that appear questionable or defective each Buyer/End User shall promptly inspect and return any such Product to the Company at 15853 Olden Street, Sylmar, California 91342, accompanied by a letter stating the nature of any problems. If the Products are determined by Company to be defective in materials or workmanship directly provided by Company, Company, at its sole option, may either repair or replace the defective Products, or reimburse applicable Buyer/End User for the cost of such Products. The applicable Buyer/End User shall bear all applicable shipping costs. THIS SHALL BE BUYERS/END USERS' SOLE REMEDY. EACH BUYER/END USER AGREES THAT COMPANY WILL NOT BE RESPONSIBLE FOR ANY OTHER OBLIGATIONS RELATING TO THE PRODUCTS, INCLUDING ANY OTHER MATERIALS OR LABOR COSTS, LOSS OF USE OR ANY OTHER ITEM OR FOR ANY DELAYS IN COMPLYING WITH THIS WARRANTY BEYOND COMPANY'S REASONABLE CONTROL.

COMPANY SHALL NOT BE LIABLE FOR, DOES NOT ASSUME, AND EXPRESSLY DISCLAIMS, ANY LIABILITY, RESPONSIBILITY AND DAMAGES: DUE TO ANY BUYER/END USER'S FAILURE TO COMPLY WITH THIS WARRANTY, INCLUDING IMPROPER INSTALLATION, USE OR OPERATION; USE WITH PRODUCTS FROM OTHER MANUFACTURERS THAT DO NOT MEET ASTM OR OTHER APPLICABLE PRODUCT STANDARDS; IMPROPER CONTROL OF SYSTEM HYDRAULICS, IMPROPER WINTERIZATION PROCEDURES, IMPROPER VOLTAGE SUPPLY. CONTACT WITH INCOMPATIBLE MATERIALS OR CHEMICALS, EXCAVATION/DIGGING, EXCESSIVE WEIGHT, AND VANDALISM; DUE TO REASONABLE WEAR AND TEAR AND DUE TO ANY ACTS OF NATURE, INCLUDING LIGHTNING, EARTHQUAKES, GROUND MOVEMENT, FROST HEAVE, OR FLOODS.

COMPANY EXTENDS ONLY THIS WARRANTY AND EXPLICITLY DISCLAIMS ALL OTHER WARRANTIES, WHETHER IMPLIED OR OTHERWISE EXPRESSED, WHETHER ORAL, STATUTORY OR OTHERWISE, INCLUDING ANY IMPLIED WARRANTIES OR AFFIRMATIONS FOR SUITABILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. NO AFFIRMATION BY COMPANY OR ANY OF ITS REPRESENTATIVES, BY WORDS, CONDUCT OR OTHERWISE, SHALL CONSTITUTE A WARRANTY. THIS WARRANTY MAY NOT BE TRANSFERRED, EXTENDED, ALTERED OR OTHERWISE MODIFIED IN ANY MANNER, EXCEPT BY WRITTEN AGREEMENT SIGNED BY COMPANY.

BY ITS ACCEPTANCE OF THE PRODUCTS, EACH BUYER/END USER EXPRESSLY WAIVES ALL OTHER LIABILITY OR OBLIGATION OF ANY KIND OR CHARACTER OF COMPANY, INCLUDING LIABILITY PREDICATED UPON CONTRACT, TORT, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE GROUNDS, AND ALL, IF ANY, DAMAGES AND LOSSES AS A RESULT THEREOF, INCLUDING ALL, IF ANY, COMPENSATORY, GENERAL, SPECIAL, CONSEQUENTIAL, INCIDENTAL, OR PUNITIVE DAMAGES. WITH RESPECT TO SUCH WAIVERS, EACH BUYER/END USER EXPLICITLY WAIVES CALIFORNIA CIVIL CODE §1542 WHICH STATES "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THIS RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY ADVERSELY AFFECTED HIS SETTLEMENT WITH DEBTOR" AND ALL OTHER SIMILAR STATUTORY, COMMON AND CASE LAW RIGHTS, DEFENSES AND LIMITATIONS.

Having previously independently inspected the Products, or a sample, as fully as desired having the opportunity to and having not done so, upon acceptance of delivery of the Products and except as otherwise herein explicitly provided, each Buyer/End User by acceptance and use of the Products accepts them in their "AS IS" and "WITH ALL FAULTS" condition, without any other warranty, expressed, implied or otherwise, and accepts and assumes the entire risk and cost of all servicing, remediation and consequences thereof. This Warranty is governed by California law and any unenforceable provisions severed with all remaining provisions. As used herein, "including" includes "without limitation".

## TABLE OF CONTENTS

Warranty ........................................................................ Inside Cover
IMPORTANT INFORMATION ................................................................ 4
  Use of this Manual • Hazards & Information Definitions ................................ 4
  System Engineering, Installation & Maintenance ...................................... 4
  Installer Training .................................................................... 5
General Installation Safety Instructions .............................................. 5
Introduction .......................................................................... 5
Handling & Storage .................................................................... 6
  Pipe & Fittings ...................................................................... 6
  One-Step Solvent Cement ............................................................. 6
Listing, Approvals, Application & Use ................................................. 7
  Light Hazard Occupancies ............................................................ 7
  Residential Occupancies ............................................................. 7
  Low Pressure Dry Pipe and Pre-action Systems ....................................... 8
  Concealed Installations ............................................................. 9
  Combustible Concealed Installation with Specific Use Sprinklers ..................... 9
  Combustible Attic Spaces with Specific Use Sprinklers .............................. 10
  Exposed Installations ............................................................... 10
  Expanded Use with Light Hazard Extended Coverage and Residential Sprinklers ....... 10
  Unfinished Basement with Exposed Solid Wood Joist Installation ..................... 11
  Extended Coverage Quick Response Sprinklers ....................................... 14
  Return Air Plenum Installation • Garage Installations .............................. 15
  Ambient Temperature Limitations • High Temperature Areas .......................... 15
  Cold Temperature Areas ............................................................. 15
  Fire Sprinkler System Risers ....................................................... 16
  Underground Fire Service • C-UL Listing Requirements ............................. 18
  Factory Mutual Approvals ........................................................... 20
  Loss Prevention Certification Board LPCB ........................................... 20
  NSF International .................................................................... 20
  Penetrating Fire-related Walls & Partitions ........................................ 21
  Heat Sources & Open Ceiling Areas .................................................. 21
  Use With Other Manufacturers' Pipes, Fittings & Solvent Cement ..................... 22
Installation & Joining ................................................................ 22
  Solvent Cement Welded Joints ....................................................... 22
  Solvent Cement Requirements ........................................................ 27
  Threaded Connections ............................................................... 27
  TorqueSafe™ Gasket Sealed Thread Connections ....................................... 29
  Painting Pipe & Fittings • Cleaning ................................................ 30
  Transition to Other Materials • Flanged Connections ................................ 30
  Flange Data & Bolt Torque • Grooved Coupling Adapters .............................. 31
  Adjustable Sprinkler Head Adapter Installation ..................................... 33
  System Acceptance Testing (Hydrostatic Pressure Test) .............................. 34
  Recommended Cut-in Procedures for Systems Modification or Repair .................. 35
Engineering Data ...................................................................... 37
  Pipe & Fitting Specifications • Hydraulic Design ................................... 37
  Allowance for Friction Loss in Fittings ............................................ 38
  Hanger & Supports ................................................................... 38
  Riser Support ....................................................................... 41
  Exposed Installations • Earthquake Bracing • Trenching ............................. 42
  Snaking/Deflection of Pipe ......................................................... 43
  Backfilling ......................................................................... 45
  Material Properties ................................................................. 46
  Expansion & Contraction ............................................................. 47
  Expansion Loop & Offset Configurations ............................................. 49
Review - Do's & Don'ts ................................................................ 52
Material Safety Data Sheet ............................................................ 53

# EXHIBIT "2"



**Plastic**
**Failure**
L A B S

**Dr. Duane Priddy** • Founder & CEO

Toll Free USA:          877.668.4345
International:          +1.989.385.2355
Email:          priddy@plasticfailure.com
Web:          www.plasticfailure.com

## Test Protocol for Forensic Analysis of Signature Building CPVC Fire Sprinkler Piping for Testing to Assess Integrity and Strength Relative to New Unused Piping

TESTING PROTOCOL

a.   Inspect CPVC piping systems in Signature Building Systems units.

b.   Select locations where drops are present in the piping system where the fluid inside would have been trapped. Photo-document the location(s) selected.

c.   Drain the liquid from inside the piping and collect the fluid in a new drinking water bottle that had just been opened and emptied out.

d.   Label the container indicating the location from where the fluid had been collected.

e.   Provide the fluid sample(s) to a laboratory for analysis to identify and quantify the chemical composition of the fluid.

f.   Select CPVC piping samples from each Signature building which had been exposed to the antifreeze. Each sample collected should have at least one fitting and at least 18 inches of CPVC piping attached. Each opening of the fitting must have at least 2 inches of pipe sticking from every socket. Each piping sample is to be entirely wrapped in aluminum foil to protect it against chemical exposure during shipment to the laboratory selected for the testing. The foil wrapped samples are to be bubble wrapped and placed in a secure box for shipment. Each sample is to be tagged as to which building the sample and location from where the sample was removed.

g.   Obtain a sample of unused CPVC pipe and fittings (of the same brand) for comparison testing.

h.   Perform ASTM F442 Section 8.6 flattening test on all samples collected.

i.   Perform ASTM D1599 burst testing of all piping samples.

j.   Examine and compare the fracture surface of all piping assemblies tested using optical microscopy and SEM/EDS looking for evidence of chemical absorption/weakening of the piping.

# EXHIBIT "3"

## 15. LIMITED WARRANTY.

Subject to the conditions and limitations set forth in this Section 15, Signature warrants to the Buyer for the Warranty Period that all Work which Signature is responsible for performing under the Scope of Work conform to the Specifications, and shall be free of material defects in the workmanship and the materials provided by Signature.

The Warranty Period for each Building shall commence at the time of Final Completion for each Building but in no case before every unit has been placed on a foundation or another unit.

## 16. WARRANTY CLAIMS.

In the event that, during the Warranty Period, Buyer shall discover the existence of Defective Work, Buyer shall provide Manufacturer written notice of such Defective Work to Signature prior to the termination of the Warranty Period. Within ten (10) days after receipt of the Warranty Claim, Signature will notify Buyer of Its acceptance or denial of all or any part of the Warranty Claim, subject, however, to the following criteria:

e. Any dispute regarding the warranty shall be resolved by PFS, and their decision shall be binding and conclusive on both parties.

## 17. DISCLAIMER OF WARRANTIES.

Except as set forth above, Signature makes no representations or warranties, expressed or implied including warranties fitness for a particular purpose. Signature does not authorize, nor does it adopt, confirm, or ratify, any warranty or representation made by any person or any other source

regarding the goods and/or services sold or provided under this Agreement, other than those specifically described elsewhere in this Agreement. BUYER'S REMEDY IS LIMITED TO REPAIR OR REPLACEMENT, AT SIGNATURE'S OPTION if no dispute and if a dispute, it shall be resolved by PFS and their decision shall be binding and conclusive on both parties OF THE DEFECTIVE WORK. SIGNATURE MAKES NO WARRANTY WHATSOEVER IN RESPECT TO MATERIALS, EQUIPMENT OR GOODS FOR WHICH THERE EXISTS A WARRANTY FROM A PRODUCT MANUFACTURER, OR FOR MATERIALS, EQUIPMENT OR GOODS MANUFACTURED OR SUPPLIED TO SIGNATURE BY THE BUYER OR BY THIRD PARTIES. Party acting under Buyer's instructions FOR USE IN THE UNITS, OR FOR MATERIALS, EQUIPMENT OR GOODS SUPPLIED BY A PRODUCT SUPPLIER OR PRODUCT MANUFACTURER

Signature shall not be liable for any loss or damages, including lost profits, or any other incidental or consequential damages arising in any manner from this warranty or claims hereunder.

### 7. FINAL COMPLETION.

"Final Completion" means after Substantial Completion as defined above the Manufacturer's completion of (i) the Installation Scope of Work as set forth in Exhibits "B" and "G" and (ii) the list of deficiencies set forth on the Punch List as provided for in Section 12.

The punch list items (as mentioned in this Paragraph) are to be prepared in writing by the Buyer and the Manufacturer within the time periods set forth in Section 11 of this Agreement. As the Punch List items are completed, the Buyer shall sign Signature's paperwork in accordance with Section 12. Final Completion shall not be

established until the design professional verifies it in writing.

## EXHIBIT    D   DEFINITIONS    RIDER    PG 21

Warranty: The limited warranty set forth in Section 15 of the Terms and Conditions of Sale.

Warranty Claim: A claim, or a notice of a claim, by Buyer for the correction or remediation of Defective Work pursuant to the Warranty.

## SPRINKLER SYSTEM

## 17.3 Fire Sprinkler System (Dwelling Unit AND CORRIDORS):

NOTE: Fire sprinkler system per drawings provided by RESCOMFP dated 06/09/16

NOTE: Perform WATER TEST OF installed SPRINKLER SYSTEM PIPING AND COMPONENTS

17.3.1 Piping- CPVC piping system with cemented joints and connections. Signature shall provide all piping as specified by RESCOMFP in RESCOMFP drawings dated 06/09/16.

« Sprinkler supply risers in shafts and piping in common areas is not provided. Fittings and all accessories for intermodular connections are not provided. »

**17.3.2 Sprinkler Head (Interior Ceiling Mount)**- Flush mounted or concealed head. Residential concealed fast response pendant sprinkler head with domed plate. 1/2" NPT thread size, 4.9 K-factor and 155 degree temperature rating. [Tyco Series LFII SIN #TY2234 (White) or equal]

17.3.3 Sprinkler Head (Interior Wall Mount)- Horizontal sidewall type sprinkler heads with ½" NPT thread size, 155° F temperature rating and 4.4 K factor. [Tyco Fire & Building Products LFII Series (TY 2334) Sprinkler Head (White) or equal]

17.3.4 Sprinkler Head (Exterior Wall)- Dry type horizontal sidewall sprinkler head with 1" NPT, 175• F temperature rated and 5.6 I< factor. [Tyco Series DS-1 Dry Type (TY3335) Horizontal Sidewall Sprinkler Head (White) or equal]

NOTE:

SIGNATURE SHALL PROVIDE AND INSTALL ALL INTERMODULAR SPRINKLER SYSTEM PIPING, EQUIPMENT, HEADS, FIXTURES, VALVES, PIPING, ETC, AS MAY BE NEEDED FOR FIRE SPRINKLER SYSTEM WITHIN EACH APARTMENT AND CORRIDOR  ACCORDING TO THE SPRINKLER DRAWINGS PROVIDED BY RESCOMFP DATED 06/09/16.

PROVIDE SPRINKLER PIPING AS SPECIFIED BY RESCOM FP FROM MODULES THROUGH THE CORRIDOR CEILING BAND FOR STUB CONNECTIONS IN CORRIDOR.

17.4 PROVIDE AND INSTALL FIRE ALARMS AS PER VI\D STAMPED DRAWINGS DATED 06/09/16..

17.4

Note: Insulation shall be tented over fire sprinkler pipes installed in attic spaces.

«All equipment, fixtures, piping, valves, fittings, hangers and any item relating to fire sprinkler work not specified above is not provided. »

# EXHIBIT "4"

AGREEMENT

This Agreement ("Agreement") is made and entered into by and between Signature Building Systems of PA LLC ("Signature" or "Manufacturer"), a Pennsylvania limited liability company, and Partners 3190 LLC ("Buyer"), a limited liability company organized under the laws of the Commonwealth of Massachusetts, on this 24th day of June, 2016 (the "Effective Date").

This Agreement consists of this cover and Signature block plus: Terms and Conditions of Sale:

| | |
|---|---|
| Exhibit A: | Identification of Development, Project Site and Work Sites |
| Exhibit B: | Scope of Work |
| | Exhibit C.  Specifications Dated June 9, 2016 |
| Exhibit D: | List of drawings dated |
| Exhibit E: | Purchase Price/Transfer of Ownership |
| Exhibit F: | Definitions Rider |
| Exhibit G: | Tax Exempt Status Certificates |
| Exhibit H: | Signature Construction Project Timeline |
| Exhibit I: | Plans (Sealed set of Modular w/GC Contract Drawings) |
| Exhibit J: | Change Order Form |
| Exhibit K: | Acceptance of Goods Form |
| Exhibit L: | Final Acceptance Form |
| Exhibit M: | Insurance  Requirements |
| Exhibit N: | Prevailing Wage Rates |

Signed as of the Effective Date

| Signature Block | Signature Block |
|---|---|
| Partners 3190, LLC | Signature Building Systems of PA, LLC |
| By _Justin Introso_ | By _VICTOR D. ORPHULIS_ |
| Its  _Manager_ | Its  _MANAGING MEMBER_ |

TERMS AND CONDITIONS OF SALE

Buyer is the Owner of real estate located at the site identified on Exhibit A (the "Development" and/or "Project"). Signature has agreed to provide certain services and/or goods to the Buyer to further the Development. This Agreement and any exhibits or amendments hereto (collectively, the "Agreement") shall set forth the terms and conditions of the relationship between Buyer and Signature. All capitalized terms, unless otherwise defined in the text, shall have the meanings ascribed in the Definitions Rider, Exhibit D to this Agreement.

1. PURCHASE AND SALES OF SERVICES AND GOODS. Signature shall sell and Buyer shall purchase the goods and/or services described in the Modular Unit Specifications, Plans, and Scope of Work pursuant to the Exhibits attached hereto.

   a. PERFORMANCE OF THE WORK. Manufacturer shall construct, manufacture, deliver to the Job Site, and install Units that are: free of defects; constructed, manufactured, and installed in a good and workman like manner and in strict accordance with the Exhibit D Drawings and Exhibit C Specifications as provided by Buyer. Manufacturer shall use new materials. Manufacturer may substitute materials set forth on the design professional's finish schedule only if (i) in manufacturer's reasonable opinion such changes do not affect the performance of the modular unit AND (ii) Buyer assents in writing to the proposed change via a Change Order as described below. If Manufacturer seeks a change, Manufacturer shall notify Buyer and Design Professional in writing explaining the need or desirability for the substitution and the technical data or specification sheet/cut sheet for the substituting materials; and include a Change Order form. The Buyer and the Design Professional's review and approval of any change order is only as it relates to the overall design concept and is not for the size, dimensions, strength, suitability, or installation means or method of the substituting material, all of which remain the Manufacturer's sole responsibility.

   b. Buyer shall be responsible for providing a foundation ready and accessible site hand-picked free of severe dips, humps or curves and unrestricted by obstacles to provide a clear approach of seventeen feet in width and height and able to receive each Unit the Manufacturer delivers. Manufacturer is responsible for the equipment, materials, means, and methods needed to effectuate proper installation. Manufacturer shall use only trained, licensed, insured personnel to operate equipment used for installation, and to effectuate the installation. Signature will maintain a qualified project manager with knowledge of construction means, methods and costs up through the date of Substantial Completion and at all times that it is actively performing work at the Project, not including the Punch List work provided for in Section 12.

2. PRICE AND PAYMENT TERMS. The Contract Price for the goods and/or services to be provided by Signature hereunder is set forth on Exhibit E. Buyer shall pay Signature for such goods and/or services in accordance with the payment terms set forth on Exhibit E.

3. COMMENCEMENT AND PROJECT COMPLETION DATES. The date of commencement for Signature's performance hereunder (the "Commencement Date") shall be the date upon which the Buyer provides Signature with (i) a written Notice to Proceed subsequent to the execution of this Agreement, and (ii) the non-refundable deposit as outlined on Exhibit E.   Signature shall

achieve Substantial Completion and Final Completion in accordance with the Project Timeline attached as Exhibit H, which shall establish the "Original Project Completion Date", subject to adjustments, additions, and deletions by signed Change Orders or as otherwise provided for in this Agreement (the "Adjusted Project Completion Date").

4. **FOUNDATION AND SITE STORAGE NOTICE.** Notwithstanding anything to the contrary contained in this Agreement, if, on or before thirty (30) days prior to the Original Project Completion Date, the Buyer has failed to provide Signature with (i) a certification from a licensed surveyor that the foundation for the buildings where the Units are to be installed are complete and satisfactory for the purposes intended, and are within the allowable tolerances as provided by Signature , and (ii) written notification that there is storage space capable of accepting up to Forty Five (45) Units to allow for a continuous installation process, Signature shall not be obligated to complete its Work by the Original or Adjusted Project Completion Date. If Buyer fails to provide the documents outlined above, Signature shall establish an Adjusted Project Completion Date upon obtaining the certification and notice identified above, which shall be a minimum of sixty (60) days beyond the receipt of such certification and notice unless a shorter or longer period of time is agreed to by the parties. To the extent that the certification received from the licensed surveyor is materially inaccurate or incomplete and the foundation(s) is/are not within Signature's allowable tolerances, then Signature shall notify Buyer of the specific deficiency in writing as provided herein, and provide Buyer 30 days to cure said matter. If Buyer fails to cure said matter within said time then Signature shall be entitled to recover any actual damages incurred as a result of being provided an erroneous or incomplete materially inaccurate certification. Buyer agrees to pay Signature all invoicing due, consistent with the provisions of this Agreement, regardless of the delay defined herein. Signature is not responsible for the acts and omissions of the licensed surveyor, regardless of whether such surveyor is retained and/or paid for by the Buyer or one of its separate contractors or subcontractors, and Signature is also not solely responsible for the acts and omissions of its separate contractors, subcontractors and/or suppliers.

5. **ON-SITE ACTIVITIES OF MANUFACTURER.** Manufacturer shall comply with all OSHA regulations applicable to its work during delivery and installation. Manufacturer shall use proper equipment to load and unload materials and to install the Units, and it will supply trained personnel to operate that equipment. Manufacturer shall have at least one competent person on site during delivery and installation. Manufacturer must supply its employees with Personal Protective Equipment, ensure its employees are trained in the use of that equipment, and ensure that its employees are using that equipment on the jobsite. Manufacturer shall be responsible for any fines or penalties levied by any governmental authority for safety violations attributable to it or to any of its sub-subcontractors.

6. **SUBSTANTIAL COMPLETION.** "Substantial Completion" occurs when all Units are removed from the transporter, and placed and secured upon the foundation or another Unit, and the installation is reviewed, inspected and confirmed by the design professional of record to be in compliance with the contract documents, subject to the completion of any Punch List items as provided for in Section 12.

7. **FINAL COMPLETION.** "Final Completion" means after Substantial Completion as defined above, the Manufacturer's completion of (i) the Installation Scope of Work as set forth in Exhibits "B" and "C" and (ii) the list of deficiencies set forth on the Punch List as provided for in Section 12 .

## AGREEMENT

This Agreement ("Agreement") is made and entered into by and between Signature Building Systems of PA LLC ("Signature" or "Manufacturer" ), a Pennsylvania limited liability company, and Partners 3190 LLC ("Buyer"), a limited liability company organized under the laws of the Commonwealth of Massachusetts, on this 24th day of June, 2016 (the "Effective Date").

This Agreement consists of this cover and Signature block plus: Terms and Conditions of Sale:

| | |
|---|---|
| Exhibit A: | Identification of Development, Project Site and Work Sites |
| Exhibit B: | Scope of Work |
| | Exhibit C.  Specifications Dated June 9, 2016 |
| Exhibit D: | List of drawings dated |
| Exhibit E: | Purchase Price/Transfer of Ownership |
| Exhibit F: | Definitions Rider |
| Exhibit G: | Tax Exempt Status Certificates |
| Exhibit H: | Signature Construction Project Timeline |
| Exhibit I: | Plans (Sealed set of Modular w/GC Contract Drawings) |
| Exhibit J: | Change Order Form |
| Exhibit K: | Acceptance of Goods Form |
| Exhibit L: | Final Acceptance Form |
| Exhibit M: | Insurance Requirements |
| Exhibit N: | Prevailing Wage Rates |

Signed as of the Effective Date

| Signature Block | Signature Block |
|---|---|
| Partners 3190, LLC | Signature Building Systems of PA, LLC |
| By _Justin Introsa_ | By _VICTOR A. OROGLIUS_ |
| Its  _Manager_ | Its  _MANAGING MEMBER_ |

**TERMS AND CONDITIONS OF SALE**

Buyer is the Owner of real estate located at the site identified on Exhibit A (the "Development" and/or "Project"). Signature has agreed to provide certain services and/or goods to the Buyer to further the Development. This Agreement and any exhibits or amendments hereto (collectively, the "Agreement") shall set forth the terms and conditions of the relationship between Buyer and Signature. All capitalized terms, unless otherwise defined in the text, shall have the meanings ascribed in the Definitions Rider, Exhibit D to this Agreement.

1.  PURCHASE AND SALES OF SERVICES AND GOODS. Signature shall sell and Buyer shall purchase the goods and/or services described in the Modular Unit Specifications, Plans, and Scope of Work pursuant to the Exhibits attached hereto.

    a.  PERFORMANCE OF THE WORK. Manufacturer shall construct, manufacture, deliver to the Job Site, and install Units that are: free of defects; constructed, manufactured, and installed in a good and workman like manner and in strict accordance with the Exhibit D Drawings and Exhibit C Specifications as provided by Buyer.  Manufacturer shall use new materials. Manufacturer may substitute materials set forth on the design professional's finish schedule only if (i) in manufacturer's reasonable opinion such changes do not affect the performance of the modular unit AND (ii) Buyer assents in writing to the proposed change via a Change Order as described below. If Manufacturer seeks a change, Manufacturer shall notify Buyer and Design Professional in writing explaining the need or desirability for the substitution and the technical data or specification sheet/cut sheet for the substituting materials; and include a Change Order form. The Buyer and the Design Professional's review and approval of any change order is only as it relates to the overall design concept and is not for the size, dimensions, strength, suitability, or installation means or method of the substituting material, all of which remain the Manufacturer's sole responsibility.

    b.  Buyer shall be responsible for providing a foundation ready and accessible site hand-picked free of severe dips, humps or curves and unrestricted by obstacles to provide a clear approach of seventeen feet in width and height and able to receive each Unit the Manufacturer delivers. Manufacturer is responsible for the equipment, materials, means, and methods needed to effectuate proper installation. Manufacturer shall use only trained, licensed, insured personnel to operate equipment used for installation, and to effectuate the installation. Signature will maintain a qualified project manager with knowledge of construction means, methods and costs up through the date of Substantial Completion and at all times that it is actively performing work at the Project, not including the Punch List work provided for in Section 12.

2.  PRICE AND PAYMENT TERMS. The Contract Price for the goods and/or services to be provided by Signature hereunder is set forth on Exhibit E. Buyer shall pay Signature for such goods and/or services in accordance with the payment terms set forth on Exhibit E.

3.  COMMENCEMENT AND PROJECT COMPLETION DATES. The date of commencement for Signature's performance hereunder (the "Commencement Date") shall be the date upon which the Buyer provides Signature with (i) a written Notice to Proceed subsequent to the execution of this Agreement, and (ii) the non-refundable deposit as outlined on Exhibit E.  Signature shall

achieve Substantial Completion and Final Completion in accordance with the Project Timeline attached as Exhibit H, which shall establish the "Original Project Completion Date", subject to adjustments, additions, and deletions by signed Change Orders or as otherwise provided for in this Agreement (the "Adjusted Project Completion Date").

4. FOUNDATION AND SITE STORAGE NOTICE. Notwithstanding anything to the contrary contained in this Agreement, if, on or before thirty (30) days prior to the Original Project Completion Date, the Buyer has failed to provide Signature with (i) a certification from a licensed surveyor that the foundation for the buildings where the Units are to be installed are complete and satisfactory for the purposes intended, and are within the allowable tolerances as provided by Signature , and (ii) written notification that there is storage space capable of accepting up to Forty Five (45) Units to allow for a continuous installation process, Signature shall not be obligated to complete its Work by the Original or Adjusted Project Completion Date. If Buyer fails to provide the documents outlined above, Signature shall establish an Adjusted Project Completion Date upon obtaining the certification and notice identified above, which shall be a minimum of sixty (60) days beyond the receipt of such certification and notice unless a shorter or longer period of time is agreed to by the parties. To the extent that the certification received from the licensed surveyor is materially inaccurate or incomplete and the foundation(s) is/are not within Signature's allowable tolerances, then Signature shall notify Buyer of the specific deficiency in writing as provided herein, and provide Buyer 30 days to cure said matter. If Buyer fails to cure said matter within said time then Signature shall be entitled to recover any actual damages incurred as a result of being provided an erroneous or incomplete materially inaccurate certification. Buyer agrees to pay Signature all invoicing due, consistent with the provisions of this Agreement, regardless of the delay defined herein. Signature is not responsible for the acts and omissions of the licensed surveyor, regardless of whether such surveyor is retained and/or paid for by the Buyer or one of its separate contractors or subcontractors, and Signature is also not solely responsible for the acts and omissions of its separate contractors, subcontractors and/or suppliers.

5. ON-SITE ACTIVITIES OF MANUFACTURER. Manufacturer shall comply with all OSHA regulations applicable to its work during delivery and installation. Manufacturer shall use proper equipment to load and unload materials and to install the Units, and it will supply trained personnel to operate that equipment. Manufacturer shall have at least one competent person on site during delivery and installation. Manufacturer must supply its employees with Personal Protective Equipment, ensure its employees are trained in the use of that equipment, and ensure that its employees are using that equipment on the jobsite. Manufacturer shall be responsible for any fines or penalties levied by any governmental authority for safety violations attributable to it or to any of its sub-subcontractors.

6. SUBSTANTIAL COMPLETION. "Substantial Completion" occurs when all Units are removed from the transporter, and placed and secured upon the foundation or another Unit, and the installation is reviewed, inspected and confirmed by the design professional of record to be in compliance with the contract documents, subject to the completion of any Punch List items as provided for in Section 12.

7. FINAL COMPLETION. "Final Completion" means after Substantial Completion as defined above, the Manufacturer's completion of (i) the Installation Scope of Work as set forth in Exhibits "B" and "C" and (ii) the list of deficiencies set forth on the Punch List as provided for in Section 12 .

The punch list items (as mentioned in this Paragraph) are to be prepared in writing by the Buyer and the Manufacturer within the time periods set forth in Section 11 of this Agreement. As the Punch List items are completed, the Buyer shall sign Signature's paperwork in accordance with Section 12. Final Completion shall not be established until the design professional verifies it in writing. Design Professional's verification shall not be unreasonably withheld.

8.  DELAYS AND CONTRACT PRICE ADJUSTMENT. Subject to the provisions of Section 4 above, if Signature is delayed over 30 days in performing any work under this Agreement because of delays caused by any act or omission of the Buyer (or anyone acting on behalf of Buyer, including any agent, employee, subcontractor, independent contractor of the Buyer) (collectively "Buyer Delay"), the Contract Price shall be increased by any actual damages incurred by Signature in performing any such work that were caused by such Buyer Delay but only for delays over 30 days. Increases in the Contract Price pursuant to this Section 8 shall be in addition to, and not in limitation of, any fees payable or costs reimbursable to Signature as otherwise provided for in this Agreement or any other adjustment in the Contract Price provided for herein. If Buyer is delayed over 30 days in performing any work under this Agreement or in marketing the Units for Sale or Lease because of delays caused by any act or omission of Signature or anyone acting on its behalf, including any agent, employee, subcontractor, or independent contractor of Signature (collectively "Signature Delay"), Signature shall pay Buyer the actual damages that were caused by such Signature Delay, but only for delays over 30 days which shall include, but are not limited to, any liquidated damages assessed against and paid for by Buyer to the extent that they are the result of an Signature Delay. Notwithstanding the above, neither party shall be held responsible for delays unless the party alleging damage provides the party sought to be held accountable with written notice, describing the delay, and providing no less than a 7 day period by which the delay may be cured, and if it is cured no damages shall be due or payable. Notwithstanding anything to the contrary stated herein, Signature shall have no liability to Buyer for any Signature Delay resulting from (i) any act or omission of a material supplier or product manufacturer where Buyer specified or required the use of a specific material supplier or product manufacturer, or (ii) any other act or omission of a material supplier or product manufacturer causing or resulting in a Signature Delay, including, but not limited to, delivering defective material and/or products that must be re-ordered or delivering material and/or products later than anticipated by Signature on the Effective Date. Neither party shall be entitled to an increase in Contract Price or reimbursement where a delay results from acts of God, acts of terrorism, strikes, disruption of supply chains, unavailability of specified products under commercially reasonable terms, wars, floods, hurricanes, earthquakes, tropical storms, tornados, fires, snow, rain, excess winds, accidents or other catastrophic events or business disruptions outside the control of Signature and the Buyer ("Excusable Delays"). Regardless of cause or the right to an adjustment in the Contract Price, each day of delay which is not the fault of Signature shall extend all stated deadlines of Signature as set forth above and in the schedule by a corresponding number of days.

9.  BUYER'S RESPONSIBILITIES. Any and all Work in connection with the Development that is reasonably necessary for Signature to complete delivery of the goods and/or services contracted for hereunder and that is not specifically and expressly identified as the responsibility of Signature shall be the responsibility of the Buyer.

10. CHANGE ORDERS. Except as provided elsewhere in this Agreement, all changes to

Signature's Work, or to any of parties' duties, obligations and rights under this Agreement, shall be by a formal written change order (a "Change Order") signed by both parties. Prices for all changes covered by a Change Order shall be negotiated and agreed to by the parties prior to the performance of any of the work subject to the Change Order.

11. INSPECTION AND ACCEPTANCE BY BUYER. Once Signature has completed manufacturing the Units, Buyer and Design Professional shall have the right to inspect all Units at Signature's manufacturing facility and shall inspect the Units upon delivery. Buyer shall have the right to reject any Unit found to be structurally defective or failing to meet the Modular Unit Specifications for such Unit. In the event that Manufacturer and Buyer disagree as to whether or not a non-conformity exists or whether said Modular Unit is properly corrected, then in said event, PFS (the "Inspectors") shall be asked to review the Modular Unit to decide if a non-conformity exists or whether it was properly corrected, and their decision shall be binding and conclusive on both parties and shall be written and contain reasonable detail. If a non-conformity exists, as determined by the Inspectors, said "Scheduled Delivery Date," as set forth in the "Notice to Proceed," shall be extended until corrections or substitution of the Modular Unit that complies with the Inspectors' determination has been provided. Notwithstanding if disagreement as to a non-conformity exists and it is determined by said Inspectors that said Modular Unit conforms with the approved Plans and Specifications, then in any of said events, Buyer shall take immediate delivery of said Modular Unit. Buyer agrees that minor material shortages, minor defects, minor damage, or any other concerns that Buyer may have with a Unit that can be addressed by Signature at the delivery site shall not provide a basis for rejection of a Unit shall have the contractual obligation for timely remedy such minor material shortage, defect, damage, or concern. As used herein, "minor" shall mean issues that cost less than Five Hundred Dollars to correct, either alone or combined. If Buyer rightfully rejects a Unit, Signature shall promptly, but in any case within 14 days after the rejection, repair or otherwise bring the Unit into compliance with the Modular Unit Specifications. Any Unit not rejected upon delivery shall be deemed to have been accepted by the Buyer, unless a defect is later discovered that was latent or would not reasonably have been noticed by Buyer.

12. PUNCH LIST. The Buyer agrees to inspect and prepare in conjunction with the Site Supervisor assigned to the job by Signature, a written Punch List within five business days of receiving written notice from Signature that a Unit has been delivered to the site at 3383-3385 Washington Street in Boston is ready for final inspection. Signature shall then correct any issues listed on the Punch List that fall within Signature's Scope of Work. Upon receiving notification from Signature that the applicable items on the Punch List have been completed, the Buyer shall have five (5) business days to inspect the Unit and either (i) accept the Unit as is, or (ii) deliver written rejection of a Punch List item and provide Signature with valid reasons for said rejection. If the Buyer fails to inspect the Unit or provide written rejection of a Punch List item by Buyer or design professional within five (5) business days of receiving such notice from Signature, then the Buyer shall be deemed to have finally accepted the Unit and Signature shall have no further obligation to repair or replace any Punch List items for such Unit. When all valid Punch List items are complete or accepted by Buyer as provided above, the Buyer shall sign Signature's paperwork for each Unit acknowledging completion and acceptance of that Unit. Notwithstanding anything to the contrary in this Agreement, the "Residential Construction Performance Guidelines", latest edition, published by the National Association of Home Builders, shall be the accepted objective standard of performance tolerances. Should the Buyer or its contractors commence work on a Unit prior to the Punch List items being completed by

Signature, the parties agree that no additional items will be added to the Punch List.

13. RISK OF LOSS. Up to and including the time a Unit is set on the foundation or another Unit (the "Risk of Loss Transfer Date"), Signature shall assume the risk of loss regarding that particular Unit and applicable materials, equipment, and transporters. All risk of loss regarding said Unit shall pass to the Buyer once the Unit has been set on the foundation or another Unit, at which time the Buyer shall become solely responsible to insure that Unit and applicable materials and equipment against all risk of loss, including, but not limited to, damage which is sustained while Signature is completing its Scope of Work and/or Punch List at the Project. Notwithstanding the above, to the extent that the Buyer is responsible for maintaining security at the Project and the designated temporary storage site, the Buyer shall be responsible for all loss or damage to any Unit, materials, equipment or transporter arising from the failure to provide adequate security at the Project.

14. PERMITS, LICENSES, AND APPROVALS. All permits, licenses, approvals and other documents required by any governmental authority or any applicable laws, which may be necessary for Signature to perform hereunder, other than (i) authorizations necessary for Signature to engage in business generally, (ii) authorizations for the delivery or installation of the Units in connection with this Agreement in the jurisdiction of the place of delivery specified herein, or (iii) state approvals for Signature or Signature's contractors to manufacture the Units, are the responsibility of the Buyer. Notwithstanding any other provision of this Agreement to the contrary, the Buyer shall, at Buyer's expense, be solely responsible to (a) ensure that the drawings, plans, and specifications for the Units are in compliance with any applicable laws, and Buyer hereby represents and warrants to Signature that the design of the Units and the Plans and Specifications attached hereto as Exhibits G and B meet the requirements of all applicable laws; and, (b) obtain building approvals, licenses and permits, any federal, state or local approvals, licenses or permits to erect or set the Units and any other approvals, licenses or permits necessary for Buyer's use of the Units and otherwise to ensure compliance with applicable laws. If Signature is required to obtain any additional licenses and/or permits, other than those listed as Signature's responsibility above, to complete its Scope of Work, Buyer shall reimburse Signature for the cost of obtaining those additional licenses and/or permits. The failure of Buyer to perform its responsibilities under this Agreement shall not release or relieve Buyer from its obligations to make payment of the Contract Price.

15. LIMITED WARRANTY. Subject to the conditions and limitations set forth in this Section 15, Signature warrants to the Buyer for the Warranty Period that all Work which Signature is responsible for performing under the Scope of Work conform to the Specifications, and shall be free of defects in the workmanship and the materials provided by Signature. The Warranty Period for each Building shall commence at the time of Final Completion for each Building but in no case before every unit has been placed on a foundation or another unit and shall terminate at 5:00 p.m. (local time) on the 365th day following the date of said Final Completion. For avoidance of doubt, a separate Warranty Period shall apply to each Building. Buyer acknowledges that any alteration of the Unit after delivery shall be at Buyer's sole risk and responsibility and may void the warranty outlined above.

16. WARRANTY CLAIMS. In the event that, during the Warranty Period, Buyer shall discover the existence of Defective Work, Buyer shall provide Manufacturer written notice of such

Defective Work to Signature prior to the termination of the Warranty Period. Within ten (10) days after receipt of the Warranty Claim, Signature will notify Buyer of its acceptance or denial of all or any part of the Warranty Claim, subject, however, to the following criteria:

a.  Any item listed on the Buyer's Warranty Claim that in fact complies with the Specifications shall not constitute Defective Work.

b.  Any item listed on the Buyer's Warranty Claim that involves labor or materials not specifically identified as within the Scope of Work Signature is to perform under Exhibit B shall not constitute Defective Work.

c.  Any item listed on the Buyer's Warranty Claim relating to a particular Building that was caused by an event or occurrence more than one year after Substantial Completion of all the Work applicable to that particular Building shall not be deemed to be Defective Work unless caused by an act or omission of Signature that occurred during the Warranty Period.

d.  Any item listed on the Buyer's Warranty Claim that was caused by the Buyer, its agents, employees, contractors or any other persons or entities other than Signature, including, but not limited to, damage caused by connection to water, sewer, electric, gas, phone or communication, or other systems, normal wear and tear, or any other work performed by Buyer or its agents, employers or contractors shall not be deemed to be Defective Work.

e.  Any dispute regarding the warranty shall be resolved by PFS, and their decision shall be binding and conclusive on both parties.

17. <u>DISCLAIMER OF WARRANTIES.</u> Except as set forth above, Signature makes no representations or warranties, expressed or implied. Signature does not authorize, nor does it adopt, confirm, or ratify, any warranty or representation made by any person or any other source regarding the goods and/or services sold or provided under this Agreement, other than those specifically described elsewhere in this Agreement.  BUYER'S REMEDY IS LIMITED TO REPAIR OR REPLACEMENT, AT SIGNATURE'S OPTION if no dispute and if a dispute, it shall be resolved by PFS and their decision shall be binding and conclusive on both parties. OF THE DEFECTIVE WORK. SIGNATURE MAKES NO WARRANTY WHATSOEVER IN RESPECT TO MATERIALS, EQUIPMENT OR GOODS FOR WHICH THERE EXISTS A WARRANTY FROM A PRODUCT MANUFACTURER, OR FOR MATERIALS, EQUIPMENT OR GOODS MANUFACTURED OR SUPPLIED TO SIGNATURE BY THE BUYER OR Any Party acting under Buyer's instructions FOR USE IN THE UNITS, OR FOR MATERIALS, EQUIPMENT OR GOODS SUPPLIED BY A PRODUCT SUPPLIER OR PRODUCT MANUFACTURER SPECIFIED BY BUYER, unless manufacturer also chose the supplier or Manufacturer. Signature shall not be liable for any loss or damages, including lost profits, or any other incidental or consequential damages arising in any manner from this warranty or claims hereunder.

18. <u>PREVAILING WAGES.</u> Buyer understands there are federal, state, county and/or local laws, ordinances, codes, rules or regulations that require the payment of prevailing wages at the wage rates set forth in Exhibit N , if any, to those laborers, mechanics, carpenters and other

skilled tradesmen employed by Signature on site only. Buyer is not responsible for any wages to anyone employed by, or working on behalf of, or under Signature, including, but not limited to, subcontractors and agents.

19. INSURANCE. The insurance obligations of both parties shall be outlined in the Insurance Requirements attached hereto as Exhibit M to this Agreement.

20. WAIVERS OF SUBROGATION. Buyer and Signature waive all rights against each other for damages caused by fire, flood, weather, winds, or any other acts of God or other causes of loss to the extent covered by property insurance maintained by either party at any time, including after completion of the Project. All policies of property insurance shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property.

21. INDEMNITY. To the fullest extent permitted by law, Signature shall indemnify, defend and hold the Buyer and its agents and employees harmless (collectively "Indemnify") from and against any and all third party claims, losses, costs, damages, liabilities, fines and penalties, demands, and causes of action, including, but not limited to, attorneys' fees (hereinafter "Claims"), to the extent arising out of the negligent performance or non-performance of Signature's Work or material, or work of materials, or those for whom Signature is legally responsible, or Signature's breach of any of its obligations under this Agreement. Under no circumstances is Signature obligated to indemnify Buyer for any Claim to the extent arising out of the Buyer's own negligent conduct or breach of contract, or the negligence of a third party for whom Signature is not responsible. This indemnification provision does not negate, abridge, or reduce any other rights or obligations of the persons and entities described herein that they would have absent this indemnification provision. This indemnification obligation is not limited in any way by Signature's insurance coverage. Signature will defend all such indemnified claims at its own cost and expense. In claims against any person or entity indemnified under this Section by an employee of Signature, the indemnification obligation under this Section shall not be limited by a limitation on amount or type of damages, compensation, or benefits payable by or for Signature under workers' or workmen's compensation acts, disability benefit acts, or other employee benefit acts. This provision shall survive the Substantial Completion of the Work, Final Completion of the Work, and termination of this Agreement.

To the fullest extent permitted by law, Buyer shall indemnify Signature and its agents and employees from and against any and all Claims to the extent arising out of the negligent performance or non-performance of the Buyer's responsibilities at the Project, or the Buyer's breach of any of its obligations under this Agreement. Under no circumstances is the Buyer obligated to indemnify Signature for any Claim to the extent arising out of Signature's own negligent conduct or breach of contract, or the negligence of a third party for whom Buyer is not responsible. This indemnification provision does not negate, abridge, or reduce any other rights or obligations of the persons and entities described herein that they would have absent this indemnification provision. This indemnification obligation is not limited in any way by the Buyer's insurance coverage. Buyer will defend all such indemnified claims at its own cost and expense. In claims against any person or entity indemnified under this

Section by an employee of the Buyer the indemnification obligation under this Section shall not be limited by a limitation on amount or type of damages, compensation, or benefits payable by or for the Buyer under workers' or workmen's compensation acts, disability benefit acts, or other employee benefit acts. This provision shall survive the Substantial Completion of the Work, Final Completion of the Work, and termination of this Agreement.

22. GOVERNING LAW & VENUE. Any legal action or litigation pursuant to this Agreement shall be governed by the laws of the State of Pennsylvania. Any arbitration carried out under Section 23 of this Agreement shall be governed by the laws of the State of Massachusetts.

23. DISPUTES. Buyer and Signature will attempt to resolve any dispute arising out of their business relationship through good faith negotiation by officers empowered to make decisions. Upon demand of any party hereto, any dispute, claim or controversy, arising out of, connected with or relating to this Agreement between or among parties hereto, shall be resolved by binding arbitration as provided herein, except for insurance claims. Disputes may include, without limitation, contract claims, tort claims, counterclaims, disputes as to whether a matter is subject to arbitration, warranty claims, claims arising from this Agreement or other documents related thereto executed in the future, or claims arising out of or connected with the transaction reflected by this Agreement (collectively, the "Disputes"). Any controversy or claim arising out of or relating to this agreement or the breach thereof shall be settled by common law arbitration before the Commercial Section of the American Arbitration Association in Boston, MA at a hearing to be conducted. Each party shall appoint one arbitrator and the two arbitrators shall select a third arbitrator, and the panel shall thereupon conduct the arbitration process and render a decision. Judgment upon the award rendered by the arbitrator shall be final and conclusive and the parties hereby authorize the entry of judgment upon the award by the Prothonotary of any court having jurisdiction thereof.

24. WORK STOPPAGE. Signature shall have the right to stop any and all work under this Agreement, whether at the manufacturing facility or on site, in the event Buyer fails to make any payment timely when due under the terms of this Agreement or other obligation of the Buyer under this Agreement. In the event of a work stoppage by Signature, Signature shall have the right to extend all stated deadlines as set out above and in the Project Timeline by the amount of time Signature properly stopped work, and to recover its actual damages arising from the work stoppage.

25. ASSIGNMENT. Neither the Buyer nor Signature shall assign its interest in this Agreement without the written consent of the other, which shall not be unreasonably refused. Any such purported assignment shall be null and void. Notwithstanding the above, either party may assign its rights and/or obligations under this Agreement to a parent or affiliated organization of the party so long as the parent or affiliated organization has an equal or better financial condition as the party and agrees to all provisions of this Agreement. Notwithstanding anything to the contrary above, the Buyer may assign its rights and obligations under this Agreement to any lending institution which is financing, in whole or in part, the development of the Project provided that such lending institution agrees in writing to assume the Buyer's obligations under this Agreement in the event that the assignment becomes effective.

26. LIEN RIGHTS. Nothing in this Agreement shall limit any rights or remedies that Signature may

have under lien laws (legal or equitable) including, but not limited to, the Uniform Commercial Code and the laws of the jurisdiction of the Project applicable to liens of vendors or construction contractors.

27. TAXES  Signature based it's proposal and contract on the assessment of use taxes imposed by the Commonwealth of Massachusetts only. If it is determined that the City of Boston assess a tax to Signature based on this project, the BUYER agrees to be solely responsible for the payment of this assessment or Tax

28. NOTICES. The notice that Units are ready for shipment, or that transporters will be retrieved, will be made by facsimile transmission, electronic mail, or any form of overnight mail requiring a Signature acknowledging receipt at the below address. All other notices required or permitted by this Agreement shall be in writing and sent by facsimile, certified or registered mail, return receipt requested, to the proper party.

**FOR SIGNATURE**

Victor Dephillips
Signature Building Systems of PA, LLC
1004 Springbrook Avenue
Moosic, PA 18507
Phone: (570) 774-1000
Fax: (570) 774-1010
Email: Vicd@sbsmod.com

**FOR PARTNERS 3190 LLC**

Justin Iantosca
709 Centre St. Suite 202
Jamaica Plain, MA 02130
Phone: (617) 522-2421
Fax: (617) 977-9796
Email: justin@arborviewcompanies.com

With Copies to:
Gordon E. Meyer, Esq.
Gordon E. Meyer & Associates, P.C.
8 Winchester St
Boston, MA 02116
Phone: (617) 482-2377
Fax: (617) 482-0629
Email: gmeyer@gmeyerlaw.com

29. INTERPRETATION. Should a discrepancy arise between the Plans attached as Exhibit D hereto and the Modular Unit Specifications attached as Exhibit C hereto, the Modular Unit Specifications shall prevail.

30. RELATIONSHIP BETWEEN THE PARTIES. The relationship between the Buyer and Signature is that of a buyer and seller only. Nothing contained herein is intended to or shall be construed as creating any partnership, joint venture or other relationship between the parties other than that of buyer and seller. Neither party is authorized to act as or shall be deemed to be the agent of the other or hold itself out as the agent of the other or as having any authority to bind the other.

31. SEVERABILITY. Should any part of this Agreement for any reason be declared invalid, such decision shall not affect the validity of this Agreement. Any remaining portion shall remain

in force and effect as if this Agreement had been executed with the invalid portion thereof eliminated, as it is hereby declared the intention of the parties hereto that they would have executed the remaining portion of this Agreement without putting therein any such part or parts, or portions which may, for any reason, be hereafter declared invalid.

32. <u>SUCCESSORS</u>. This Agreement shall inure to the benefit of and shall be binding upon all of the parties hereto, their successors and assigns, except as otherwise indicated.

33. <u>HEADINGS</u>. The headings used in this Agreement are for convenience of reference only and shall not affect or be taken into account in interpreting the meaning of the provisions hereof.

34. <u>ENTIRE AGREEMENT</u>. This Agreement is the entire agreement between the Buyer and Signature and supersedes all prior agreements, whether written or oral, between the parties with respect to the subject matter, constitutes a complete statement of the terms of agreement between the parties, and supersedes any and all prior agreement or understandings between the parties with respect to the subject matter. No course of prior dealings between the parties shall be relevant or admissible to supplement, explain, or vary any of the terms of this Agreement. Acceptance of, or acquiescence in, a course of performance rendered under this or any prior agreement shall not be relevant to or admissible to determine the meaning of this Agreement even though the acquiescing party has knowledge of the nature of the performance and an opportunity to make objection.

35. All Attached Exhibits A-N, are incorporated herein.

**EXHIBIT A**
**IDENTIFICATION OF DEVELOPMENT, PROJECT SITE AND WORK SITES**

The work site shall be known as:

3383-3385 Washington Street, Jamaica Plain, MA

# EXHIBIT B
# SCOPE OF WORK

## GENERAL SCOPE OF WORK

1) Contracting Requirements
   a) Building Permit (Buyer)
   b) Electrical Permit (Buyer)
   c) Sewerage Permit  (Buyer)
   d) Mechanical Permit (Buyer)
   e) Sprinkler Permit (Buyer)
   f) Temporary Access Roads (Buyer)
   g) Temporary Utilities (Buyer)
   h) Waste Management (Buyer)
   i) Project Management and Coordination (Buyer)
   j) Complete Interior and Exterior Clean Up (Buyer)
   k) Site Locates (Buyer)
   l) Property Survey (Buyer)
   m) State (Signature)
   n) Local Taxes (Buyer )
   o) Liability Insurance (Both per Exhibit K)

2) Concrete Foundation
   a) Footings (Buyer)
   b) Stem Wall (Buyer)
   c) Crawl Space Moisture Barrier (Buyer)
   d) Foundation Drainage (Buyer)
   e) Foundation Anchors and Building Tie Downs (Buyer supplied and installed anchors; Signature  supplies and Buyer installs tie downs imbedded in the foundations; Signature fastens tie downs to Units after set)
   f) Sill Plating and Sill Insulation (Buyer)
   g) Crawl Space Access Doors Buyer
   h) Basement Stairs (Buyer)
   i) Crawl Space Vents (Buyer)
   j) Crawl Space Floor Insulation (Buyer)
   k) Responsibility for Design & Construction of the Foundation & Rigid Steel Frame (Buyer)

3) Earthwork
   a) Earth Moving Equipment (Buyer)
   b) Clearing and Grubbing (Buyer)

    c) Cut and Fill (Buyer)
    d) Excavation (Buyer)
    e) Haul Spoils (Buyer if Required)
    f) Soil Erosion Control (Buyer if Required)

4) Exterior Improvements and sidewalks (Buyer)
    a) Concrete Curbing (Buyer)
    b) Asphalt Parking Lot (Buyer)
    c) Plants and Trees (Buyer)
    d) Electric Utilities (Buyer)

5) Utilities to demark location at house
    a) Mechanical (Buyer)
    b) Electrical (Buyer)
    c) Sanitary Sewerage (Buyer)
    d) Electrical Utilities (Buyer)

6) Modular Building Delivery
    a) All modules provided per drawing (Signature)
    b) Delivery of Modules to Site Address Provided (Signature)
    c) Crane Rental for Setting Modules (Signature)

7) Modular Set
    a) Set of Modules (Signature)
    b) Removal of Shipping Materials (Signature shall collect all debris and place in on-site containers supplied by Buyer. Buyer responsible for cost of containers)
    c) Waste Management Boxes (Buyer responsible to supply)
    d) Roof modules, wrap top of ceiling frame prior to roof closure with water resistant plastic wrap for temporary site protection (Signature)

8) Stitch
    a) Over-frame cap truss N/A
    b) Complete Roof  frames over modular portion (Signature)
    c) Interior Corridors, basement  and common areas (Buyer)
    d) Exterior Finish (Buyer)

9) Building Structural
    a) Mate Line Structural Connections (Buyer )
    b) Building Tie Down Straps connected from foundation walls (Signature)
    c) Level and plum interior structure after set (Signature, subject to foundation being within tolerances provided by Signature)

10) Building Interior
    a) Sheetrock walls and ceilings constructed at factory (Signature), except completing mating walls and ceilings (labor by Buyer, material by Signature)*
    b) Subflooring inside the units and corridors ( labor by Buyer, Signature to supply materials), not including site constructed areas (by Buyer)*

**2.3** <u>Underlayment (Vinyl Flooring Areas)</u> – UNDERLAYMENT FOR AREAS WITH VINYL FLOORING SHALL CONSIST OF ¼" luan plywood glued and stapled in place.

**2.4** <u>Underlayment (Ceramic Tile Areas)</u> – 1/4" USG Fiberock Aqua-Tough underlayment glued and fastened to decking.

**2.5** <u>Thermal Insulation in ALL Deck Floors</u> – R-38 fiberglass batt thermal insulation with kraft paper vapor barrier secured with steel retainer wires at 12" on center.

**2.6** <u>BALCONIES:</u>

> FRAMING SHALL BE PRESSURE TREATED FLOOR JOISTS.  SUB DECKING EXTERIOR GRADE 3/4" T&G  PLYWOOD. FLOOR MEMBRANE SHALL BE  0.06" VINYL DECK SURFACE MEMBRANE  (DURADEK)  OKANAGAN SERIES LEATHER OR EQUAL.

**2.7** TENANT ACCESS  3rd LEVEL ROOF DECK:

Ceiling/floor joists of 3rd level roof decks shall be 2x12 to match band or of other construction as determined by structural considerations.

The 3rd level patio deck floor shall be flat with 0.045" epdm membrane.

The 3rd level roof deck flooring shall be 3/4 " exterior grade T&G  plywood.

Insulation in 3rd level ceiling/floor joists shall be R38.

SEE SECTION 7.1 FOR MORE DETAILS.

**2.8** PARAPETS  On 3RD LEVEL ROOF DECK: Parapets with scuppers shall be constructed per Rode STAMPED drawings and specifications  dated 05/09/16 and delivered as separate components to be installed by set crew.

Parapets shall be of 2x6 construction with 3/4" cdx exterior plywood on one side. Minimum  height of 3'-6"

**3.0** WALL CONSTRUCTION:

**3.1 Exterior Wall [UL Design No. U356 (1 Hour Fire Rating – LB)]**

> • <u>Framing</u> – 2" x 6" (SPF #2 or better) wood studs spaced at 16" on center. Double 2" x 6" (SPF #2 or better) wood top plate and single 2" x 6" (SPF #2 or better) wood bottom plate.

> • <u>Exterior Sheathing</u> – Exterior grade CDX  3/4" plywood fastened to framing per fire rated assembly.

• __Insulation__ – R-21 (5-1/2") fiberglass batt thermal insulation with kraft paper vapor barrier.

• __Interior Wallboard__ – 5/8" type X fire code gypsum wallboard fastened per fire rated assembly.

**3.2    Interior Mating Wall [UL Design No. U341 (1 Hour Fire Rating – LB)]**

• __Framing__ – 2" x 4" (SPF #2 or better) wood studs spaced at 16" on center with double 2" x 4" (SPF #2 or better) wood top plate and single 2" x 4" (SPF #2 or better) wood bottom plate or as specified by structural review.

• __Interior Wallboard__ – 5/8" type X fire code gypsum wallboard fastened per fire rated assembly.

• __Mate Wall Sheathing:__ Exterior of all mate walls shall be exterior grade 7/16" OSB and shall be fastened to framing per fire rated assembly.

• __Mate Wall Insulation:__  All interior mate walls shall contain fiberglass batt insulation:    3 1/2" (R-11/15) unfaced fiberglass batt insulation (R-21 if 2"x6" studs).

**3.3 '    Corridor Separation Wall [GA File No. WP 3243 (1 Hour Fire Rating – LB)]**

• __Framing__ – 2" x 4" (SPF #2 or better) wood studs spaced at 16" on center with double 2" x 4" (SPF #2 or better) wood top plate and single 2" x 4" (SPF #2 or better) wood bottom plate.

• __Insulation__ – 3 1/2" (R-11) unfaced fiberglass batt insulation.

• __Interior Wallboard__ – 5/8" type X fire code gypsum wallboard fastened per fire rated assembly.  << _Wallboard for Corridor face shall be shipped loose for field installation. Fasteners and all accessories are not provided._ >>

**3.4   Tenant Separation Wall [GA File No. WP 3605 (1 Hour Fire Rating – LB)]**

• __Framing__ – 2" x 4" (SPF #2 or better) wood studs spaced at 16" on center with double 2" x 4" (SPF #2 or better) wood top plate and single 2" x 4" (SPF #2 or better) wood bottom plate, or as specified by structural review.

**3.4.1   The tenant separation walls between adjoining units 202/302  and 302/303 shall be double 2x4 construction with BOTH INSIDE WALLS  sheathed  WITH 5/8" TYPE X FIRE CODE GYPSUM WALLBOARD  and shall be fastened to framing per fire rated assembly.**

• __Insulation__ – All tenant separation walls shall contain 3 1/2" (R-11/15) unfaced fiberglass batt insulation (R-21 if 2"x6" studs).

• __Interior Wallboard__ – 5/8" type X fire code gypsum wallboard fastened per fire rated assembly.

**3.5     Four Story Interior Stair, and Elevator Shaft Wall [GA File No. WP 4135 or WP 3820 (2 Hour Fire Rating – LB)]**

•       Framing – 2" x 4" (SPF #2 or better) wood studs spaced at 16" on center with double 2" x 4" (SPF #2 or better) wood top plate and single 2" x 4" (SPF #2 or better) wood bottom plate.

•       Insulation – 3 1/2" (R-11) unfaced fiberglass batt insulation.

•       Interior Wallboard – Double layer 5/8" type X fire code gypsum wallboard fastened per fire rated assembly.

   **3.7 Interior Partition (No Fire Rating – NLB)**

             •       Framing – 2"x 3", 2" x 4" or 2" x 6" (SPF #2 or better) wood studs spaced at 16" on center with single 2" x 3", 2" x 4" or 2" x 6" (SPF #2 or better) wood top and bottom plates.

          •       Interior Wallboard – 1/2" gypsum wallboard.

   <u>Note</u>: Bathroom walls shall be moisture resistant gypsum wallboard.

**4.0     Exterior Doors and Windows:**

 NOTE:      All required exterior doors, balcony slider doors and all windows (with jam extensions), including all hardware and lock sets, shall be selected and provided by Partners and delivered to Signature's Moosic, PA facility at no cost to Signature, and for installation by Signature.

   The completion of the modular units is dependent upon the timely receipt of the windows and doors from Partners.

**5.0     EXTERIOR COVERING:**

         •       Water-Resistive Barrier Wrap and Flashing – Commercial grade, weather resistant, air infiltration barrier with overlapped and taped seams, secured with plastic caps and fasteners on all exterior walls. Flexible and straight flashing tapes with butyl adhesive shall be installed at exterior doors and windows. [Dupont Tyvek Commercial Wrap, Tyvek Tape, FlexWrap and StraightFlash or equal]

**6.0     CEILING CONSTRUCTION [UL Design L539 (1 Hour Fire Rating)]:**

   **6.1     Ceiling Height** – Ceiling height shall be 8'-6" in all areas EXEPT WHERE NOTED

   NOTE:       Ceiling height in certain areas shall be reduce by 6" to 8'-0" to accommodate HVAC ducts as per Rode drawings dated 05/09/16.

   NOTE: The ceiling bands shall be 2x10 plus a 2x6 ledger.

   **6.2     Framing** – 2" x 6" (SPF #2 or better) wood joists spaced at 16" on center with 2" x 10" (SPF #2 or better) wood band joists plus 2x6 ledger OR LVL PER STRUCTURAL Solid

2" x 6" wood bridging.

6.3     **Exterior Framing:**     The ceiling joists that form the floor of the 3rd level roof patio decks shall be 2" x 12" (SPF #2 or better) wood joists spaced at 16" on center with 2" x 12" (SPF #2 or better) wood band joists OR LVL PER STRUCTURAL.   Solid 2" x 12" wood bridging.

6.4     Ceiling Board – 5/8" type C fire code gypsum wallboard fastened per fire rated assembly.

6.5     Ceiling insulation in all units shall be R21 fiberglass batt thermal insulation

NOTE:  The ceiling insulation in the exterior ceiling per 6.3 above shall be R-38 fiberglass batt thermal insulation secured with steel retainer wires at 12" on center.

6.6     Ceiling Accesses – Drywall access openings shall be provided for completion of mechanical, electrical and plumbing connections in the field.  << *Drywall for close up of ceiling accesses shall be shipped loose for field installation.* >>

FIRE CODE NOTE:

THE CEILING JOISTS OF THE MOD BELOW AND THE FLOOR JOISTS OF THE MOD ABOVE SHALL BE SITUATED TO MAINTAIN A MAXIMUM CLEARANCE OF 5.75" IN ORDER TO BE FIRE CODE COMPLIANT.

THE SPACE ABOVE ANY LOWERED CEILINGS SHALL BE FILLED WITH NON-COMBUSTIBLE FIBERGLASS MATT INSULATION WITH NO PAPER BACKING  AS NECESSARY TO MAINTAIN A MAXIMUM  CEILING GAP OF 5-3/4" BETWEEN LAYERS OF INSULATION

# 7.0   ROOF/CEILING CONSTRUCTION (FLAT ROOF) [GA File No. RC 2602 (1 Hour Fire Rating)]:

7.1     THIRD LEVEL TENANT ACCESS  FLAT  ROOF DECK:

7.1.1   Third Roof decking  for 3rd level –  shall be 3/4 " OSB

7.1.2   Third Level Roof Covering – Fully adhered .045" thick, single-ply, non-reinforced EPDM membrane roofing system meeting ASTM D4637 and installed per manufacturer's instructions OVER  1/2" of polyisol insulation.

7.1.3   Interior Ceiling Board of 3 rd level units under perimeter roof decks shall be – Double layer 5/8" type X fire code gypsum wallboard fastened per fire rated assembly.

7.1.4   Ceiling Accesses – Drywall access openings shall be provided for completion of mechanical, electrical and plumbing connections in the field.

*Drywall for close up of ceiling accesses shall be shipped loose for field installation.*

**7.1.5** Insulation: The third level ceiling insulation under the 3rd level perimeter roof decks shall be R38 fiberglass batt thermal insulation with kraft paper vapor barrier.

**7.1.6** Framing:    The ceiling joists in the perimeter areas that form the floor of the 3rd level roof patio decks shall be 2" x 12" (SPF #2 or better) wood joists spaced at 16" on center with 2" x 12" (SPF #2 or better) wood band joists  OR LVL PER STRUCTURAL.  Solid 2" x 12" wood bridging.

## 7.2   FOURTH  LEVEL FLAT  ROOF DECK:

Framing:      The ceiling/roof joists of the 4TH level FLAT ROOF  shall be 2" x 12" (SPF #2 or better) wood joists spaced at 16" on center with 2" x 12" (SPF #2 or better) wood band joists  OR  LVL PER STRUCTURAL.  Solid 2" x 12" wood bridging.  Open joists shall be used as necessary to facilitate utility connections.

**7.2.1** TAPERED INSULATION – Tapered polyisol insulation at ¼" per foot from 4th level ridge per Rode  STAMPED drawings dated 05/09/16.

**7.2.3** Roof Sheathing – 5/8" oriented strand board (OSB) shall be fastened to framing per fire rated assembly.

**7.2.4** Signature shall include additional framing and structural support  for a roof mounted structure to support the condenser field on the 4th level tapered roof deck per the drawings and specifications provided by Rode IN STAMPED DRAWINGS DATED 05/09/16.

**7.2.5** Ceiling Board – Double layer 5/8" type X fire code gypsum wallboard fastened per fire rated assembly.

**7.2.6** Ceiling Accesses – Drywall access openings shall be provided for completion of mechanical, electrical and plumbing connections in the field.  << *Drywall for close up of ceiling accesses shall be shipped loose for field installation.* >>

**7.2.7** Insulation:    The ceiling insulation above the 4th level units shall be R38 fiberglass batt thermal insulation with kraft paper vapor barrier

**7.2.8** Tapered/Flat Roof Insulation (Crickets) – Minimum 1/4" per foot polyisocyanurate insulation pitched toward roof drainage system as indicated on Rode  STAMPED DRAWINGS DATED 05/09/16. Insulation approved for use with EPDM membrane roofing manufacturer.

**7.2.9** Roof Covering – Fully adhered .06" thick, single-ply, non-reinforced EPDM membrane roofing system meeting ASTM D4637

**7.2.10** Temporary  Elevator Shaft Cover – Temporary elevator  shaft cover shall be provided.  << *Equipment and permanent flashings are not provided.* >>

**7.3**   ELEVATOR HEAD HOUSE ON 4th LEVEL FLAT  ROOF DECK:

NOTE: Framing and construction for the elevator head house  per Rode
STAMPED DRAWINGS  AND SPECIFICATIONS DATED 05/09/16.  Built as separate
components and delivered to site for installation by set crew.

**7.3.1 Elevator Head House Roof Covering** – Fully adhered .045" thick, single-ply,
non-reinforced EPDM membrane roofing system meeting ASTM D4637 and
installed per manufacturer's instructions.

8.0   INTERIOR STAIR (COMMON AREA)

   •   Interior Stair – Three LVL stringers with 5/4" carpet grade pine treads and pine
risers.  Stair geometry shall be maximum 7" rise and minimum 11" run with maximum 1 1/4"
nosing projection.  << *Upper stair tread shall be shipped loose for field installation.* >>

   •   Landings – 2" x 10" wood joists spaced at 8" on center.  Double 2" x 10" (SPF
#1/2) wood band joists.  3/4" thick oriented strand board (OSB) tongue and groove floor decking
glued and fastened to framing.

   •   Tread and Riser Covering – Raised square rubber tread with matching rubber
riser.  [Johnsonite RH-SQ Tread (Color Choice) or equal]

   •   Railing – Unfinished beech sloped and straight railings provided. Shipped
loose for field installation by Partners.

   •   Handrail – Unfinished beech handrail wall mounted with metal brackets.
Shipped loosed for field instllation by Partners.

   *NOTE:  First level  stair including stair, railing, handrails and all*
*accessories are NOT  provided.*

9.0   ELEVATOR:

   •   Elevator Shaft – Front wall omitted at elevator entries on all levels to facilitate
installation of the elevator guiderails.  Install gypsum wallboard inside elevator shaft on side and
rear walls in the factory.  Provide structural blocking in elevator shaft walls as required for
attachment of guiderails.

   •   Provide structural steel safety beam  with minimum 5,000 pound capacity
and column support as required for elevator safety beam and other elevator shaft
structural requirements as provided.

   •   INSTALL DOUBLE 5/8" 2 HOUR RATED GYPSUM WALLBOARD INSIDE
ELEVATOR SHAFT ON BOTH  SIDE AND REAR WALLS

   *Elevator front walls at each level including all accessories are NOT provided.*
*Elevator, guide rails, hoist assembly and all equipment and fixtures related to same are NOT provided.*

10.0   INTERIOR DOORS:

10.1   Interior Stair Tower Door

   •   Door – 3/0 x 6/8 x 1 3/4" 24 gauge steel flush door with 4" x 25" wire glass vision
panel and 90 minute fire label.  [Taylor Building Products Dura-Door (Primed White) or equal]

   •   Frame – 90 minute fire rated adjustable throat 20/22 gauge steel frame.

[Dunbarton Rediflex (Primed Gray) or equal]

- **Silencers** – Rubber silencer for metal frame. [Ives SR64 Silencer (White) or equal]

- **Hinges** – Three 4 1/2" x 4 1/2" standard weight ball bearing hinges. [Stanley FBB179 NRP Hinge (652 Dull Chromium) or equal]

- **Exit Device** – ADA compliant, ANSI/BHMA grade 1 fire rated rim exit device with passage lever trim. [Falcon Monarch F-19-R Rim Exit Device with Dane Passage Lever (689 Painted Aluminum) or equal]

- **Closer** – ADA compliant, ANSI/BHMA grade 1 door closer with non-hold open arm. [Falcon SC61 Rw/PA Closer (689 Painted Aluminum) or equal]
- **Sill** – ADA compliant threshold with mill aluminum finish.

- **Stop** – Wall mount concave bumper with wood blocking. [Ives WS401CVV Wall Bumper (626 Satin Chrome) or equal]

## 10.2   Interior Corridor  HVAC Utility Door

- **Door** – 3/0 x 6/8 x 1 3/4" 24 gauge steel flush door with 45 minute fire label. [Taylor Building Products Dura-Door (Primed White) or equal]

- **Frame** – 45 minute fire rated adjustable throat 20/22 gauge steel frame. [Dunbarton Rediflex (Primed Gray) or equal]

- **Silencers** – Rubber silencer for metal frame. [Ives SR64 Silencer (Gray) or equal]

- **Hinges** – Three 4 1/2" x 4 1/2" standard weight ball bearing hinges. [Stanley FBB179 NRP Hinge (652 Dull Chromium) or equal]

- **Lockset** – ADA compliant, ANSI/BHMA grade 2 cylindrical lever ANSI F86 storeroom function lockset.  6 pin brass cylinder core. [Falcon B581-DAN (Dane) Lever Lockset (626 Satin Chrome) or equal]

- **Sill** – ADA compliant threshold with mill aluminum finish.

- **Stop** – Wall mount concave bumper with wood blocking. [Ives WS401CVV Wall Bumper (626 Satin Chrome) or equal]

## 10.3   Dwelling Unit Entry Door

**10.3.1 Dwelling unit doors per Rode schedule AS INDICATED IN  Rode  STAMPED DRAWINGS DATED 05/09/16.**

3/0 x 6/8
PIONEER SINGLE PANEL  PRIMED WHITE OR

PLASTPRO DRS602 SMOOTH SKIN SINGLE PANEL

90 minute fire label

Smooth Steel Flush with steel jam

Full length composite stiles and rails and fire rated insulated core.  Fire rated composite frame with three 4" x 4" satin chrome spring hinges

10.3.2   Lockset – ADA compliant, ANSI/BHMA grade 2 keyed entry lever lockset with rekeying technology.  [Schlage SecureKey F51SK (Elan) Keyed Entry Lockset (626 Satin Chrome) or equal]  INCLUDE MASTER KEY FOR ALL UNITS

10.3.3   Deadbolt – ADA compliant, ANSI/BHMA grade 1, single cylinder deadbolt with rekeying technology.  [Schlage SecureKey B60SK Deadbolt (626 Satin Chrome) or equal]

10.3.4   Knocker/Viewer – Combination door knocker/viewer.  ADA Dwelling Units shall have second viewer installed at 42" A.F.F.  [Ives 02-31251U Knocker/Viewer (626 Satin Chrome) or equal]  [Ives U700 Viewer (626 Satin Chrome) or equal]

10.3.5   Stop - Wall mount concave bumper with wood blocking.  [Ives WS401CVV Wall Bumper (626 Satin Chrome) or equal]

**10.4   Interior Swing Doors (Dwelling Unit)** - Scheduled width per Rode drawings AS INDICATED IN  Rode  STAMPED DRAWINGS DATED 05/09/16.

INTERIOR SWING DOORS TO BE:

6'-8" x 1 3/8" SOLID CORE  SINGLE PANEL swing doors

Brosco Model  PR-C11-S   Square "Shaker" sticking  or

Jeldwin Madison Smooth Flat Panel Craftsman

Primed White

10.4.1   ADA compliant, ANSI/BMHA grade 3 privacy lever latch sets for Bedrooms, Bathrooms and Powder Rooms or passage lever latch sets for all other interior swing doors.  Door stops shall be hinge pin type as required.

10.4.2   All hardware for interior swing doors shall be brushed nickel finish.

**10.4.3 DELETED**

10.4.4       Doorknobs for Bedroms and Bath  shall be:    BHP Tiburon lever privacy: 95288 CHRT/CHLT

10.5   Interior Pocket Doors (Dwelling Unit) – Scheduled width per Rode  STAMPED drawings dated 05/09/16 x 6/8 x 1 3/8" hollow core SINGLE PANEL and  primed white  painted doors with standard pocket door frame, ball bearing hangers and 3/4" round x 6" long back-to-back mounted door pulls.

INTERIOR POCKET DOORS TO BE: BROSCO MODEL  PR-C11-S   Primed White

10.6   Interior Double Swing Closet Doors (Dwelling Unit) – Scheduled width  SINGLE PANEL  prime painted double swing doors with standard wood jamb.

INTERIOR  DOUBLE SWING DOORS TO BE:

BROSCO MODEL  PR-C11-S
Primed White

Closet doors shall be fitted with: BHP Tiburon dummy lever 95388CH

ADA compliant decorative trim lever on both doors with ball catch in head jamb.  Door stops shall be
hinge pin type as required.  All hardware for interior doors shall be brushed nickel finish.

10.7.   Interior Bi-Pass Closet Doors (Dwelling Unit) – Scheduled width x 6/8 x 1 3/8"  SINGLE PANEL
prime painted bi-pass doors with standard hardware track and pulls.

INTERIOR CLOSET DOORS TO BE:  BROSCO MODEL  PR-C11-S
Primed White
Closet doors shall be fitted with: BHP Tiburon dummy lever 95388CH

10.8    Interior Bi-Fold Closet Doors (Dwelling Unit) – Scheduled width x 6/8 x 1 3/8"  SINGLE PANEL
prime painted bi-fold doors with standard hardware track and pulls.

INTERIOR Bi-Fold DOORS TO BE:

BROSCO MODEL  PR-C11-S   Primed White

11.0   INTERIOR FINISH:

11.1   Dwelling Unit Interior Finish

11.1.1  Joint Tape and Compound –   LEVEL 4  SHEETROCK FINISH Joint tape with joint
compound applied to seams.

11.1.2  Wall and Ceiling Finish – Smooth  LEVEL 4  SHEETROCK FINISH

WITH ONE COAT OF  CORONADO  PRIMER LOW VOC, HIGH BUILD FLAT FINISH

<< One (1) gallon of interior paint per Modular Unit shall be shipped loose for touch ups and
repairs in the field. >>

11.1.3 WINDOW CASINGS, DOOR CASINGS AND BASEBOARD SHALL BE
PAINTED WITH BRIGHT WHITE SEMI-GLOSS ENAMEL

ALL DOORS SHALL BE PAINTED WITH SAME COLOR AS CASINGS
WITH BRIGHT WHITE SEMI-GLOSS ENAMEL

11.2 Dwelling Unit  Interior Trim

All windows and doors shall be cased with primed finger jointed 1"x4" pine

All rooms, except bathrooms, shall have primed finger jointed 1"x4" pine baseboard

11.3   Dwelling Unit <u>Closet Shelving</u> – 12" deep vinyl coated steel wire shelving with integral rod. Single shelf provided in all closets. [ClosetMaid Shelving (White) or equal]

11.4   **Common Area Interior Finish**

11.4.1   <u>Joint Tape and Compound</u> – Joint tape with joint compound applied to seams. Wall and Ceiling Finish – Smooth finish with one coat of Benjamin Moore self-priming interior latex flat finish paint.

11.5   **Corridor Interior Finish**

To be rough framed only for completion in field by Partners.

Rough electrical per VAD  STAMPED DRAWINGS DATED 06/07/16

12.0   **FLOOR COVERING:**

12.1   Dwelling Unit Floor Covering To be provided by Partners and installed in field by Partners.

Except  for bathrooms, HVAC closets an laundry rooms as noted for installation by Signature.

12.1.2  HVAC closets only shall have standard vinyl flooring provided  by and installed by Signature

12.1.3      Laundry rooms only shall have tile floors using  Prato  porcelain 12"x24" tile provided  by and installed by Signature

12.1.4      Combined laundry rooms and HVAC shall have tile floors using Prato porcelain 12"x24"  tile provided  by and installed by Signature

12.2      Floor Covering (Common Area)

To be provide by Partners and installed in field by Partners

13.0   **KITCHEN (DWELLING UNIT):**

13.1   **NOTE:**

All top and bottom kitchen cabinets, including all hardward and spacers shall be selected by Partners, provided by Partners and delivered by Partners to Signature's facility in Moosic, PA for installation by Signature and at no cost to Signature.

The completion of the modular units is dependent upon the timely receipt of the kitchen cabinets from Partners.

13.2   Kitchen cabinet bases to be installed on top of 3/4 " OSB blocking to match finished floor height.

13.3   Kitchen Countertops :

13.3.1   Signature shall provide the kitchen counter quartz material, fabrication and installation.

ALL KITCHEN COUNTER ISLAND AND PENINSULAR OVERHANGS SHALL BE 10 INCHES  EXCEPT FOR UNIT 308 THAT HAS AN 8 -3/4 INCH OVERHANG.

13.1.2   USE  MSISTONE  3/4" quartz Arctic white counter with undermount stainless steel sink and single hole for faucet

13.1.3   Tile  kitchen counter walls from counter top to bottom of upper cabinets with:

Prato: Anatolia Belgian Linen porcelain tile  4"x12"  or 4"x10"

Use bull nose for all exposed edges.

13.1.5   Kitchen Sink :

Square undermount stainless steel sink:

Alba  A5945 –D9 Undermount  23-3/8" by 17-3/4"
Provided  and installed by Signature

13.1.6 Kitchen Sink Faucet

Symmons  SPP-3510 Chrome with pull down
Provided and installed by  Signature

13.1.7      GARBAGE DISPOSAL:

InSink Erator Badger 5 Garbge Disposal.
PROVIDED  BY Partners AND INSTALLED BY Signature

14.0   APPLIANCES (DWELLING UNIT):

NOTE: All appliances  EXCEPT as noted are to be selected and provided by Partners and installed in the field by Partners.

Garbage disposal shall be selected  and provided by Partners for installation by

Signature. Partners shall deliver garbage disposal to Signature's Moosic, PA facility.

- PROVIDE HOOK UP FOR REFRIGERATOR INCLUDING COLD WATR SUPPLY FOR ICE MAKER WITH SEPARATE SHUT OFF VALVE AND ELECTRICAL

- PROVIDE HOOK UP STOVE/OVEN AND ELECTRICAL

NOTE: STOVE EXHAUST VENT WILL BE RECIRCULATING AND NOT VENTED TO OUTSIDE

## 15.0   BATHROOM :

NOTE 1:    Do not use combined light/fan units.

NOTE 2:    Unit 208 is designted as ADA Group 2. Must include barrier free ADA compliant shower and ADA compliant sink.

NOTE 3:    Bathroom Vanity light and recessed lights per VAD drawings dated xxxx.

NOTE 4:    Symmons handheld shower system to be used in showers only. Tubs will have a fixed wall mounted shower head.

### 15.1.1    Bathroom Tile:

BATHROOM TILE FLOORS:

TILE SHALL BE:        PRATO LARGE FORMAT 12"X24" ANATOLIA BELGIAN LINEN IVORY
HD RECTIFIED PORCELAIN 69-081

Installed on floors of all bathrooms.

BATHS WITH SHOWER:    Install full shower tile surround with tile from shower pan to ceiling.
Include Chrome Schulter Strip For wall tile

TILE SHALL BE:    .    PRATO LARGE FORMAT 12"X24" ANATOLIA BELGIAN LINEN IVORY
HD RECTIFIED PORCELAIN 69-081

BATHS WITH TUB:    Install full tub tile surround with tile and from tub to ceiling.
Include Chrome Schulter Strip For wall tile

TILE SHALL BE:        PRATO LARGE FORMAT 12"X24" ANATOLIA BELGIAN LINEN MIST
HD RECTIFIED PORCELAIN 69-084

15.1.2    Tiles shall be installed according to procedure provided by Partners from Tiles By Perfection.

NOTE 1:   BATHROOM WALL, SHOWER/TUB ENCLOSURE AND FLOOR TILE TO BE
PURCHASED AND INSTALLED BY SIGNATURE.

NOTE 2:   ALL TILE SHALL BE GROUTED IN THE FIELD BY PARTNERS

15.2 Bath Vanity Cabinets :

All bathroom vanity cabinets, including all hardward and spacers shall be
selected by Partners, provided by Partners and delivered by Partners to
Signature's facility in Moosic, PA for installation by Signature, and at no cost to
Signatue.

The completion of the modular units is dependent upon the timely receipt of the
kitchen cabinets from Partners.

15.3     Bath Vanity Counter TOPS:  Signature shall provide the bath vanity counter quartz
material, fabrication and installation.

USE:   MISSTONE quartz Arctic White  to match kitchen

Undermount sink with 1 hole faucet

Provide 2"  Misstone  3/4"   quartz Arctic White backsplash to match bath vanity
counter

SINK SHALL BE:

Square bowl undermount White  Alba A211  20x15x7-1/2 inch

15.3.1 Lavatory Faucet – Symmons Model SLS-3512  single handle deck mount

15.3.2 Toilet – TOTO  ECO DRAKE  CST 744E01

15.3.3 Toilet Seat:  170 CHURCH PLASTIC ELONGATED SEAT WITH CLOSED
FRONT

15.3.4 Tub  shall be:

MAAX   AKER Rubix Soaking Tub  60x32x18

Shower pans shall be:        MAAX AKER 32"x60" center drain
                             Model: 141073-000-002

i

ADA shower shall be:

FLUSH MOUNTED SHOWERPAN WITH FLOOR PITCHED TO DRAIN AND FLOOR AND SHOWER WALLS TILED TO MATCH REST OF BATHROOM.(TO BE TILED BARRIER FREE AND NOT ONE PIECE PVC).

### 15.3.5 Tub/Shower Faucet

**Symmons Shower/Handheld shower system**
**3502-H321 – V-CYL-B-TRM**

ADA compliant single lever handle tub/shower faucet trim and pressure-balancing valve with brass valve body, integral screwdriver stops and PEX crimp inlets. Faucet control handle shall be offset.

15.3.6  ADA <u>Roll-In Shower</u> –include backer for grab bars in surround walls meeting the requirements of ICC/ANSI A117.1-2003 for type B units.

### 15.3.8 Shower ONLY Faucet

**Symmons Shower/Handheld shower system  3505-H321-V-CYL-B-TRM**

ADA compliant single lever handle shower faucet trim and pressure-balancing valve with brass valve body, integral screwdriver stops and PEX crimp inlets.

- <u>Shower Rod</u> – 1" diameter straight rod with diecast expandable holder. [ProFlo PFSCR60 Shower Rod with PFC71F Holder Kit (Chrome) or equal]

NOTE:
<u>Towel Bar</u> :     Symmons towel bar:  353TB-24

<u>Toilet Paper Holder</u>:   Symmons toilet paper holder 353TP

- <u>Medicine Cabinet</u> – 16" x 22" recessed medicine cabinet with beveled edge mirror installed at standard height above vanity top. [American Pride 9422WBR Medicine Cabinet or equal]

- <u>Grab Bars (Type B Units)</u> – Provide blocking in walls at toilet per requirements of ICC/ANSI A117.1-2003. *<< Grab bars and all accessories are not provided. >>*

<u>Note</u>: Water supply and drain piping at lavatory shall be through the wall and meet the clearance requirements of ICC/ANSI A117.1-2003.

<u>Note</u>: Water supply and drain piping penetrations at all fixtures shall have chrome metal escutcheons installed including those inside cabinets.

NOTE 1:  ALL BATHROOM EXHAUST FANS SHALL BE

PANASONIC  WHISPER CEILING FAN  FV-11VQ5  OR EQUIVALENT QUIET
FAN.

NOTE 2:  Vanity lights shall be :
George Kovacs Chrome 20" wide bathroom light fixture
Style  H7689

## 16.0   HVAC:

### 16.1   HVAC (Dwelling Unit)

Partners shall  select, purchase and deliver to Signature, at Signature's Moosic, PA
facility,  for installation all required Navien heating and hot water equipment for
installation, and at no cost to Signature.

Partners shall select, purchase and deliver to Signature, at Signature's  Moosic, PA
facility,  for installation all required air handler equipment, and at no cost to
Signature. Partners to provide Navien Installation  manual to Signature.

Navien and  corresponding air handler equipment provide by Partners shall include
but not be limited to:

- NCB 180, 210 or 240 as required
- HP-30PRO -100 Watts Hydronic Package
- Lead Free Tank-less Valve Kit with 3L Relief
- GRUNDFOS Super Brute with flow check 1/25 HP 3-spd
- Taco One Zone Pump and switching relay
- Low Profile Terminatin Kit
- Navien NCB quick install manifold kit
- Navien new residential neutralizer kit
- First Company air handlers

Signature shall provide necessary fixtures, piping and connectors to install and
connect the Navien equipment provided by Partners and to provide plumbing for
connection to the air handler units.

Signature shall provide and install all necessary PVC air supply and pvc exhaust gas
venting for the Navien units per Massachusetts code.

The completion of the modular units is dependent upon the timely receipt of the
HVAC equipment from Partners.

### 16.2   Condensing Units and line Sets NOT provided or installed by Signature.

16.2.1  Rough-in electrical feed for indoor and outdoor unit locations

16.2.2  Conduit  and/or access for condenser line sets shall be provided from
mechanical closets in each unit to the 4th level roof deck condenser farm.

*<< Line set and all accessories are not provided by Signature. >>*

**16.3    HVAC Ductwork**

    16.3.1  Signature shall provide and install HVAC ductwork and sound attenuation material as indicated on the Building Facilities STAMPED DRAWINGS DATED 06/07/16

    16.3.2  Certain HVAC ducts shall be located in soffits as indicated on the Building Facilities STAMPED DRAWINGS DATED 06/07/16.

    NOTE: CEILING HEIGHT IS CERTAIN AREAS SHALL BE REDUCED BY 6" TO 8'-0" FROM 8'-6" PER RODE DRAWINGS TO ACCOMMODATE DUCTS.

    16.3.3  Supply and return air supply per Building Facilities STAMPED DRAWINGS DATED 06/07/16
    *<< Ductwork connections between modules shall be shipped loose for field installation. >>*

    16.3.4  Connections between indoor air handler and air distribution system and all accessories will be provided by Signature according to drawings from Building Facilities STAMPED DRAWINGS DATED 06/07/16

    16.3.5  Thermostat – An 18/5 wire from each thermostat location to the indoor air handler location. Thermostat height shall be in accordance with the requirements of ICC/ANSI A117.1-2003.

    16.3.6  Bathroom Exhaust Fan Duct Per Building Facilities STAMPED DRAWINGS DATED 06/07/16

    *<< Exhaust duct in shafts and exterior weather cap are not provided. Duct connectors, clamps and all accessories for intermodular connections are not provided. >>*

**16.4    Dryer Exhaust :    ALL DRYERS SHALL BE VENTLESS**

**16.5    Fire Dampers** – Accessible fire dampers at fire rated assembly penetrations shall be installed as required.

    *<< All equipment, fixtures, ductwork, piping, valves, fittings, hangers and any item relating to HVAC work not specified above is not provided. >>*

**16.6    HVAC (Corridor and Common Area)**

    •    DUCT WORK PER Building Facilities STAMPED DRAWINGS DATED 06/07/16

    *<< All equipment, fixtures, ductwork, piping, valves, fittings, hangers and any item relating to HVAC work not specified above is not provided. >>*

17.0    PLUMBING: PER BUILDING FACILITIES STAMPED DRAWINGS DATED 06/07/16

    17.1        Water Supply (Dwelling Unit)

PROVIDE WATER PRESSURE TEST OF IN MOD WATER SYSTEM

  17.1.1 **Cold water supply copper pipe shall run from HVAC closet to the corridor ceiling with a stub for corridor connection.**

  17.1.2  Water Supply Piping – CPVC Flowguard polyethylene (PEX) piping system with brass fittings and copper crimp rings. Shutoffs provided at all fixtures. Fixture groups on all levels are connected with supply piping plumbed to access areas for intermodular connections and connections to risers. Install water supply lines connecting fixtures and fixture groups in the ceiling framing in modules.
*<< Water supply risers in shafts and/or water supply piping in common areas are not provided. Piping connectors, clamps and all accessories for intermodular connections are not provided. >>*

    17.1.3   Pipe Insulation – 1" thick mold resistant flexible elastomeric thermal insulation shall be installed on piping in unconditioned spaces. [Armacell AP Armaflex Pipe Insulation or equal]

      Note: All water supply pipes at fixtures shall be installed through the wall and not through floor.

      *<< All equipment, fixtures, piping, valves, fittings, hangers and any item relating to water supply work not specified above is not provided. >>*

    17.2        Drain, Waste and Vent System (Dwelling Unit)

    17.2.1  Drain, Waste and Vent System – Schedule 40 plastic PVC pipe with cemented joints and connections. All drain, waste and vent pipes in the first and second levels shall be connected at each fixture group and plumbed to an access area for field connection to vertical drain, waste and vent piping. *<< Roof vent extensions and roof pipe flashings shall be shipped loose for field installation. >> << Drain stacks in shafts and/or drain, waste and vent piping in common areas are not provided. Piping connectors, clamps and all accessories for intermodular connections are not provided. >>*

    17.2.2   Laundry Connection – Plastic washing machine outlet box with integral hot and cold water supply and drain connection. WITH AUTO SUPPLY CUT-OFF [IPS Water-Tite Du-All Dual Drain Outlet Box (White) or equal]

    17.2.3   Drip Pan – Washer drip pans shall be installed in all Laundry closets at the Washer space with drain.

      Note: All drains for sinks shall be installed through the wall and not through floor.

      *<< All equipment, fixtures, piping, valves, fittings, hangers and any item relating to drain, waste and vent work not specified above is not provided. Radon vent is not provided. >*

17.3   **Fire Sprinkler System (Dwelling Unit AND CORRIDORS):**

NOTE: Fire sprinkler system per drawings provided by RESCOMFP dated 06/09/16

NOTE: Perform WATER TEST OF installed SPRINKLER SYSTEM PIPING AND COMPONENTS

17.3.1  Piping – CPVC piping system with cemented joints and connections.   Signature shall provide all piping as specified by RESCOMFP in RESCOMFP drawings dated 06/09/16.

<< Sprinkler supply risers in shafts and piping in common areas is not provided. Fittings and all accessories for intermodular connections are not provided. >>

17.3.2  Sprinkler Head (Interior Ceiling Mount) – Flush mounted or concealed head. Residential concealed fast response pendant sprinkler head with domed plate.  1/2" NPT thread size, 4.9 K-factor and 155 degree temperature rating. [Tyco Series LFII SIN #TY2234 (White) or equal]

17.3.3  Sprinkler Head (Interior Wall Mount) – Horizontal sidewall type sprinkler heads with 1/2" NPT thread size, 155° F temperature rating and 4.4 K factor. [Tyco Fire & Building Products LFII Series (TY 2334) Sprinkler Head (White) or equal]

17.3.4  Sprinkler Head (Exterior Wall) – Dry type horizontal sidewall sprinkler head with 1" NPT, 175° F temperature rated and 5.6 K factor. [Tyco Series DS-1 Dry Type (TY3335) Horizontal Sidewall Sprinkler Head (White) or equal]

NOTE:

SIGNATURE SHALL PROVIDE AND INSTALL ALL IN MOD SPRINKLER SYSTEM PIPING, EQUIPMENT, HEADS, FIXTURES, VALVES, PIPING, ETC, AS MAY BE NEEDED FOR FIRE SPRINKLER SYSTEM WITHIN EACH APARTMENT AND CORRIDOR ACCORDING TO THE SPRINKLER DRAWINGS PROVIDED BY RESCOMFP  DATED 06/09/16.

PROVIDE SPRINKLER PIPING AS SPECIFIED BY RESCOM FP FROM MODULES THROUGH THE CORRIDOR CEILING BAND FOR STUB CONNECTIONS IN CORRIDOR.

17.4  PROVIDE AND INSTALL FIRE ALARMS AS PER VAD STAMPED DRAWINGS DATED 06/07/16.

Note: Insulation shall be tented over fire sprinkler pipes installed in attic spaces.

<< All equipment, fixtures, piping, valves, fittings, hangers and any item relating to fire sprinkler work not specified above is not provided. >>

17.4  Gas Supply System (Dwelling Unit):

*THIS CANNOT BE DONE IN FACTORY*

Gas supply and related gas piping from first level utility room to each HVAC closet, and connection to the Navien units, shall be provided by Partners and installed in the field by

*Sd RA — CLAIRIFICATION, WE CANNOT RUN ANY GAS PIPING IN OUR BU*

Partners.

Ceiling access shall be provided in each MOD from HVAC closet to corridor ceiling to facilitate field installation of gas piping.

<< *Fittings, termination valves, appliance connectors and all accessories for all connections to MOD stub piping are not provided.* >>

<< *All equipment, fixtures, piping, valves, fittings, hangers and any item relating to gas supply work not specified above is not provided.* >>

## 18.0   ELECTRICAL:

**18.1**   **Electrical (Dwelling Unit):**  provide electrical per VAD STAMPED DRAWINGS DATED 06/07/16.

**18.2**   Provide 2" CONDUIT FOR ELECTRICAL SERVICE  CONNECTION FROM THE LOAD CENTER TO THE  CORRIDOR CEILING AREA FOR CORRIDOR CONNECTIONS.

**18.3**   <u>Electric Panelboard</u> – 150 amp indoor load center with a main breaker and 20/20 circuit space with 2" diameter conduit stubbed an accessible area.  Neutral and ground bars shall be separate.  << *Service entrance wire and all accessories are not provided.* >>

**18.4**   <u>Arc-Fault Breakers</u> – Arc-fault circuit interrupter (AFCI) breakers shall be provided for branch circuits as required by applicable NFPA NEC code.

**18.5**   <u>Branch Circuits</u> – Copper conductors, type NM-B with insulated conductors, plastic jacket and 600 volt rated.  Fire rated fiberglass electrical boxes.  [Allied Moulded Products FiberglassBox Electrical Boxes or equal]

**18.6**   <u>Receptacles</u> – Per  VAD STAMPED DRAWINGS DATED 06/07/16  with matching plastic cover plates.  Ground fault protection provided for Kitchen countertop, Bathroom, Powder Room and Exterior receptacles.  Receptacle heights shall be in accordance with the requirements of ICC/ANSI A117.1-2003.  [Leviton Decora (White) or equal]

**18.7**   <u>Dryer Receptacle</u> – 30 amp/220 volt rated wall mounted receptacle for dryer at laundry location.

**18.8**   <u>Range Receptacle</u> – 50 amp/220 volt rated base receptacle for range location in Kitchen.

**18.9**   <u>Switches</u> – 20 amp/125 volt rated rocker style switch with matching plastic cover plates.  Switch heights shall be in accordance with the requirements of ICC/ANSI A117.1-2003.  [Leviton Decora (White) or equal]

## 18.10   Light Fixtures

**18.10.1** Recessed 4" I.C. RATED Cans FOR NEW CONSTRUCTION  ( NO TRIM):

NOTE 1:
Provide and install  283  fire rated  4" recessed  can fixtures (with  1 hour fire rated assembly and enclosure) with no trim, per VAD Engineering  STAMPED drawings

dated 06/07/16  and materially in the locations as indicated on the VAD drawings subject to conflicts with ceiling joists, HVAC ducts, plumbing, sprinkler, etc.

Moisture proof recessed can fixtures over shower and bath tubs per VAD Engineering  STAMPED drawings dated 06/07/16.

NOTE 2:

Partners shall provide and shall field install on site CREE 4" LED retrofit fixtures for all 283 recessed cans at no cost to Signature.

18.10.2     Other light fixtures to be installed per VAD STAMPED DRAWINGS DATED 06/07/16

18.10.3     Wall sconces to be installed per VAD STAMPED DRAWINGS DATED 06/07/16

room lights  (one fixture per bedroom) shall be:

Possini Euro Design Opal White dual Shade 12-1/2" wide Ceiling Light Model Style  # W4588

18.11   Exhaust Fan (Bathroom ) – Ceiling mounted fan with 80 CFM exhaust capacity, radiation damper and painted steel grill.  VENTED  TO OUTSIDE

USE White PANASONIC QUIET FAN OR EQUIVALENT QUIET FAN.

18.12   Exhaust Fan/Light (Bathroom and Powder Room) – USE White PANASONIC QUIET FAN OR EQUIVALENT QUIET FAN.  Energy Star rated ceiling mounted fan with light and 110 CFM exhaust capacity. Installed with separate wall switches for fan and light.  Fire rated enclosure required.  VENTED  TO OUTSIDE

18.13   Smoke Detector – Direct wired dual ionization chamber type smoke detector with battery backup and 85 decibel alarm.  Minimum one (1) inside each Bedroom.

18.14   Combination Smoke/Carbon Monoxide Detector – Direct wired combination smoke/carbon monoxide detector with battery backup.  Minimum one (1) in each Bedroom area.

18.15   Telephone (Living Room and Bedrooms) – PHONE JACKS SHALL BE PROVIDED, INSTALLED AND LOCATED AS PER THE VAD  STAMPED DRAWINGS DATED 06/07/16  .

Category 5, 24 gauge, 2 pair telephone wiring with wall jack.  Wall jack heights shall be in accordance with the requirements of ICC/ANSI A117.1-2003.  << Terminal block and all accessories are not provided. >>

18.16   Telephone (Kitchen) –  PHONE JACKS SHALL BE PROVIDED,  INSTALLED AND LOCATED AS PER THE VAD  STAMPED DRAWINGS DATED 06/07/16.

Category 5, 24 gauge, 2 pair telephone wiring with counter height wall jack with mounting studs.  Wall jack heights shall be in accordance with the requirements of ICC/ANSI A117.1-2003.  << Terminal block and all accessories are not provided. >>

18.17   Television (Living Room and Bedrooms)

TV jacks to be located in ALL bedrooms plus living rooms per VAD STAMPED

DRAWINGS DATED 06/07/16.

RG-6 quad-shield cable television wiring with wall jack. Wall jack heights shall be in accordance with the requirements of ICC/ANSI A117.1-2003. << *Terminal block and all accessories are not provided.* >>

NOTE: USE  4 PAIR 24AWG CAT 5W PLENUM RATED VOICE/DATA CABLE AS INDICATED IN VAD ENGINEERING  STAMPED DRAWINGS DATED 06/07/16.

USE RG6 QUAD SHIELD PLENUM RATED CABLE AS INDICATED IN VAD ENGINEERING  STAMPED PLANS/SPECIFICATIONS DATED 06/07/16.

<< *All equipment, fixtures, wiring, fittings, hangers and any item relating to electrical work not specified above is not provided.* >>

18.18        Electrical (Common Area)

•        Stair Lighting, Pull Station, Exit Signage and Emergency Lighting – 4" octagon fire rated fiberglass electrical box with 3/4" electrical non-metallic tubing (ENT).  ENT shall be stubbed 3" into corridor above finished ceiling line.
        •        << *Wire, devices, fixtures and all accessories are not provided.* >>

        << *All equipment, fixtures, wiring, fittings, hangers and any item relating to electrical work not specified above is not provided.* >>

18.19    Other Electrical:        ADDITIONAL  ELECTRICAL TO BE PROVIDED AND INSTALLED BY Signature VAD STAMPED DRAWINGS DATED 06/07/16.

18.19.1    INTERCOM SYSTEM Per VAD STAMPED  DRAWINGS DATED 06/07/16. PROVIDE  access CONDUIT FORM EACH DWELLING UNIT TO Corridor

18.19.2    CORRIDOR  FIRE ALARM HORN Per VAD Engineering  STAMPED drawings dated 06/07/16:  4' octagon metal electrical box with 3/4" electrical non-metallic tubing (ENT)  ENT shall be stubbed 3" into corridor above finished ceiling line.

18.19.3    MEDIA ENCLOSURE AND PANEL Per VAD VAD STAMPED DRAWINGS DATED 06/07/16.        Telephone, category 5e voice and data, and video distribution modules in a 14"x14"  enclosure with flush mounted cover. (Leviton 47606-AHT media panel and Leviton 47605-140 enclosure with flush mount cover)

18.19.4    Other Additional Electrical as shown on VAD Engineering VAD STAMPED DRAWINGS DATED 06/07/16.

18.19.5     USE PLENUM RATED CABLE AS PER VAD ENGINEERING VAD STAMPED DRAWINGS DATED 06/07/16.

18.19.6    WIRING FOR DOOR BELL AND DOOR ACCESS WITH VIDEO per VAD VAD STAMPED DRAWINGS DATED 06/07/16.

### 20.0 TRANSPORTATION, CRANE AND SET

**20.1    Signature shall PROVIDE  all required seals, travel permits and provide for transportation of all module units from Moosic, PA to the Jamaica Plain, MA site.**

**20.2    Partners shall be responsible for providing necessary staging and storage area for the module units and for providing necessary space to locate crane.**

**20.3    Signature shall provide crane as necessary for completing the set.**

**20.4    Signature shall provide the set of all modular units, including roof parapets and elevator head house.**

**20.5    Signature shall provide a full time field supervisor to be on site through the completion of the set**

### 21.0    UNIT # 208 IS DESIGNATED AS ADA GROUP 2

**EDIT AS OF MAY 27, 2016**

**ADA BATHROOM NOTE  IN JUSTIN  IANTOSCA EMAIL DATED MAY 16, 2015 4:58 PM**

*For the ADA bathroom, we find the barrier free shower kit they spec'd out (and all others I can fin'd) to be really bad looking, this is a change but what we would like to do is have signature install the shower pan with drain at floor level and run the tile from the rest of the bathroom right into the pan (sloped to the drain) and also tile the walls of this unit (with backing for grabber bars in wall as per the ADA requirements and as in the specs). Essentially, we just want to tile the entire shower instead of doing an insert.*

**EXHIBIT D**
**LIST OF DRAWINGS**

Made part of this Agreement by reference.

1     Rode Architects Stamped Permit Set Dated May 9, 2016

2     VAD Engineering Stamped Electrical Drawings Dated June 7, 2016

3     VAD Engineering Stamped Fire Alarm Drawings Dated June 7, 2016

4     Building Facilities Stamped HVAC Drawings Dated June 7, 2016

5     Building Facilities Stamped Plumbing Drawings Dated June 7, 2016

6     RESCOMFP Sprinkler Drawings Dated June 9, 2016

# EXHIBIT E
## PURCHASE PRICE/TRANSFER OF OWNERSHIP

| | |
|---|---|
| Total Contract Amount | $2,087,300.00 |
| Number of Modules | 42 |
| Deposit Amount (25%) | $ 521,825.00 |
| **Progress Payments as Follows:** | |
| As units are produced on a bi weekly basis (40%) | $ 834,920.00 |
| **Additional Payments:** | |
| Additional Payments prior to delivery (15%) | $ 313,095.00 |
| Upon completion of delivery (10%) | $ 208,730.00 |
| Upon completion of set (7.60%) | $ 158,730.00 |
| Upon Final Inspection and completion of the punch list items (2.40%) | $50,000.00 |

**TERMS:**

Buyer shall pay Signature the contract price outlined above for the manufacturer, delivery and installation of all Units in the Project as specified in this Agreement, subject to option adjustments, additions and deductions by signed Change Order as provided in the Agreement.

Payment shall be made by Buyer to Signature in accordance with the Project Timeline set forth on Exhibit and the following breakdown procedures:

1. A deposit of 25.0% of the contract price shall be paid by the buyer so that material procurement can begin. This deposit shall be used exclusively for the material procurement for this project and such materials shall be the property of the Buyer.
2. Progress payments billed at the rate of 40% for the completed units on a bi-weekly basis.
3. An additional payment of 15.0% shall be made on finished units prior to delivery to the job site or holding area.
4. A payment of 10.0% shall be made upon delivery of the unit(s) to the job site or holding area.
5. A payment of 7.60% shall be made upon completion of set and establishment of builder punch list.
6. A final payment of $50,000.00 or 2.40% shall be made upon Final Inspection and completion of the punch list items. The $50,000 shall be held in a mutually agreed escrow account.
7. Buyer shall not unilaterally reduce any of the amounts due and owing under items (ii) and (iii) above based on any Disputes (as that terms is defined in Section 23 of the Terms and Conditions).

If the Project is canceled after Signature incurs costs for project administration, engineering, labor and materials, then all of Signature's actual costs and expenses in the furtherance of the Project shall be deducted from this deposit prior to its return.

In the event Buyer fails to make full payment of any portion of the Contract Price to Signature when due, Signature reserves the right to cease any and all work until such time as the applicable full payment is received. Signature shall have the right to take all actions and pursue all remedies provided for in this Agreement that arise out of or result from any delay(s) associated with the Buyer's failure to make timely payments, including, but not limited to, the establishment of an Adjusted Project Completion Date. Interest shall accrue on any amount overdue at the rate of fifteen percent (15%) per annum or the maximum amount allowed by Pennsylvania law, whichever is less.

In the event Signature reasonably believes Buyer is or will be unable to pay the full Contract Price as outlined above ("Belief of Payment Uncertainty"), Signature shall provide Buyer with written notice ("Payment Notice") of Signature's Belief of Payment Uncertainty. Buyer shall have three (3) business days from receipt of the Payment Notice to provide Signature with documentation acceptable to Signature proving Buyer's ability to pay. If Signature does not receive the proper documentation or still reasonably believes that Buyer is or will be unable to pay the full Contract Price as outlined above, Signature may terminate this Agreement and will return any payments made to Signature by Buyer less any costs incurred by Signature through the date of termination. If Signature terminates the Agreement under this paragraph, Buyer shall immediately pay Signature for all Work performed up to the point of termination not covered by Buyer's payments retained by Signature, if any, and Signature shall not be bound to perform any additional Work under this Agreement or otherwise. This paragraph shall in no way limit Signature's rights to recover any fees or damages for Work performed under this Agreement.

All materials purchased by Signature for this project shall be considered the property of Buyer and treated as such in the event of a production stoppage, default or bankruptcy filing by Signature.

During production, on or before the 19th of each month, or the next following business day if the aforementioned date falls on a non-business day or holiday, Buyer shall inspect the Modular Units at Signature's factory and confirm the number of Modular Units for which manufacturing is complete and the Modular Units are offline. On the 20th day of each month, or the next following business day if the aforementioned date falls on a non-business day or holiday, Signature shall submit a payment requisition to the Buyer in the form of a "Progress Payment Requisition Form". The Progress Payment Requisition Form shall identify the stage of payment for the Modular Units that have been manufactured and are offline, and those that have been delivered to the Project site.

Signature shall be entitled to bill for any work or item covered by a Change Order in accordance with the terms of such Change Order, and for all other items covered by this Agreement in accordance with the terms of this Agreement.

If however, Buyer's acts or omissions (or acts or omissions by anyone acting on behalf of Buyer, including any agent, employee, subcontractor, or independent contractor of Buyer) prevent the Units from being delivered to the Work Site by Signature within fifteen (15) days of the completion of the Units in the manufacturing facility or Signature is otherwise prevented from delivering the Units to the Work Site within fifteen (15) days of the completion of the Units, the Buyer shall pay twenty percent (20%) of the Contract Price immediately and assume all risk of loss on and insurance responsibility for the Units. Signature shall store the Units at its manufacturing facility for no more than sixty (60) days from the date of completion of the Units ("Storage Time"). Buyer and Signature

shall then schedule a time for Set and Delivery. If Buyer refuses to accept delivery of the Units after sixty (60) days from the date of completion of the Units, Signature shall charge Buyer a storage fee of One Hundred and 00/100 Dollars ($100.00) per day for each Unit stored by Buyer until delivery of the Units to the Work Site or another location specified by Buyer. Any deterioration of the Units occurring during the storage of the Units will be Buyer's sole responsibility. If Signature, in its sole discretion, is willing to fix the deterioration of the Units mentioned above, Buyer shall pay Signature all applicable fees required to return the Units to the condition the Units were in on the date Signature completed the manufacturing of the Units.

Unless otherwise directed by Signature, all payments shall be made within 10 days of invoicing via wire transfer in accordance with the below instructions:

BANK NAME: Community Bank N/A, First Liberty Bank and Trust
BANK ADDRESS: 500 Davis Street, Scranton PA 18505
ACCOUNT #: 4502047824
ABA ROUTING#: 021307559
ACCOUNT NAME:  SIGNATURE BUILDING SYSTEMS OF PA LLC
ADDRESS: 1004 SPRINGBROOK AVENUE, MOOSIC, PA 18507

## EXHIBIT F
## DEFINITIONS RIDER

As used in this Agreement, the following terms have the following meanings:

**Acceptance of Goods:** Buyer has inspected and determined that Units are substantially complete in accordance with the Agreement such that they can be utilized by Buyer for the intended use.

**Building:** The Buildings are more particularly described in the signed Plans set forth on Exhibit G.

**Defective Work:** Work that is not free of defects in workmanship or materials or which does not otherwise conform to the Specifications.

**Delivery:** Transportation to be facilitated by Signature from the manufacturing facility to the Work Site and/or storage area.

**Exterior Finish:** All siding, soffit fascia and trims.

**Foundation:** That permanent foundation, compliant regulations, ordinances and statutes, to which the Units will be permanently affixed or stacked.

**Foundation Tolerances:** The maximum dimensional tolerance of any length, width or diagonal dimension shall be one-half inch (.50"). The maximum elevation tolerance of foundation sill bearing plates for the Building shall be +/- one eighth inch (.125"). Elevations shall be documented at the following locations: (i) four corners of each Unit; (ii) all columns/piers; and (iii) every ten (10) Lineal feet of horizontal wall beam or girder supporting the Units.

**Modular Unit or Unit:** A structural component of a Building to be provided by Signature.

**Performance Tolerances:** Notwithstanding anything to the contrary in this Agreement, the "Residential Construction Performance Guidelines", latest edition, published by the National Association of Home Builders, shall be the accepted objective standard of performance tolerances.

**Plans:** Drawings and other specifications for the Units approved by Buyer.

**Pre-Delivery Inspection:** Inspection by Buyer upon Signature's completion of the manufacture of the Units prior to Delivery.

**Set:** The removal of a Modular Unit from a delivery carrier and the affixation of the Unit to its Foundation and/or connection to adjacent Units.

**Specifications or Modular Unit Specifications:** Those specifications which are attached hereto as Exhibit B.

**Stitch:** Those items of work described in EXHIBIT B, Scope of Work, and identified as "Finish"

items.

**Uniform Commercial Code:** The Uniform Commercial Code as applicable in the Jurisdiction of the Work Site.

**Warranty:** The limited warranty set forth in Section 15 of the Terms and Conditions of Sale.

**Warranty Claim:** A claim, or a notice of a claim, by Buyer for the correction or remediation of Defective Work pursuant to the Warranty.

**Work Site:** Location of development where Signature is to deliver and install the Units.

**EXHIBIT G**

**TAX EXEMPT STATUS CERTIFICATES**

This job is not tax exempt.

## EXHIBIT H
## PROJECT TIMELINE

### EXHIBIT H  3383-3385  PROJECT SCHEDULE

| | JUNE | JULY | | | | | AUGUST | | | | SEPTEMBER | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 6/24 | 7/1 | 7/8 | 7/15 | 7/22 | 7/29 | 8/5 | 8/12 | 8/19 | 8/26 | 9/2 | 9/9 | 9/16 | 9/23 |
| Execute contract | ▨ | | | | | | | | | | | | | |
| Deposit | | | ▨ | | | | | | | | | | | |
| Progress Payments | | | | | | | | ▨ | | | ▨ | | ▨ | |
| **Setup Drawings** | | | | | | | | | | | | | | |
| PFS Submittal | ▨ | | | | | | | | | | | | | |
| PFS Appoval | | | ▨ | | | | | | | | | | | |
| Address PFS Comments | | | | ▨ | | | | | | | | | | |
| MA/Boston approval | | | | | ▨ | | | | | | | | | |
| **Partners: Structural Steel Frame** | | | | | | | | | | | | | | |
| Structural Steel: Fabrication & Delivery | | | | | | | | | | | | | | |
| Complete Foundation & Footings | | | | | | | | | | | | | | |
| Pour First Level Concrete Slab | | | | | | | | | | | | | | |
| Erect Structural Frame | | | | | | | | | | | | | | |
| Survey | | | | | | | | | | | | | | |
| Install and fasten sill plates to beams | | | | | | | | | | | MODS cannot be set until survey is complete and sill plates attached. | | | |
| **Partners Purchasing & Delivery** | | | | | | | | | | | | | | |
| Stergls Window/Door Mfg. & Delivery | | | ▨ | ▨ | ▨ | | | | | | | | | |
| Navien/Air Handler purchase & Delivery | | | ▨ | ▨ | ▨ | | | | | | | | | |
| Kitchen Cabinet Mfg. & Delivery | | | ▨ | ▨ | ▨ | | | | | | | | | |
| Bathroom Vaniety Mfg. & Delivery | | | ▨ | ▨ | ▨ | | | | | | | | | |
| | | | | | | | | | | | MOD start dependent upon receipt of windows, doors and cabinets | | | |
| **MOD Manufacturing** | | | | | | | | | | | | | | |
| **MOD: Delivery and Set** | | | | | | | | | | | ▨ | | | |
| | | | | | | | | | | | MODS cannot be set until survey is complete and sill plates attached. | | | |

EXHIBIT I

APPROVED/SIGNED PLANS

The development of a sealed set of modular drawings, truss design, set manual and modular construction specifications, along with the PFS submittal drawings, will be produced by Signature pursuant to this Agreement as Additional Scope of Work.

**EXHIBIT J**

**PROPOSED CHANGE ORDER FORM**

**BUYER:  Partners 3190, LLC**

**PROJECT NAME:  3383-3385 Washington Street**

**SIGNATURE:**

**CONTRACT DATE:**

This Change Order is made this ____ day of _____ 20__ by Partners  3190, LLC ("Buyer") for the following changes in the work:

**SIGNATURE BUILDING SYSTEMS OF PA LLC**          **BUYER**

BY: _____          BY: _____

## EXHIBIT K
## ACCEPTANCE OF GOODS FORM

The undersigned representative of Buyer has inspected and accepted the following Units, numbers: Additionally, the undersigned acknowledges that all required seals are in the Units referenced above.

Buyer and Signature have identified the following non-conformities to be remedied by Signature within _____ days of the date written below:

_____

_____

_____

_____

_____

_____
_____

_____

**Signature**

_____

**Printed Name**

_____

**Title**

_____

**Date**

## EXHIBIT L
## FINAL ACCEPTANCE FORM

**The undersigned representative of Buyer has inspected and accepted the following Units, numbers: Buyer and Signature have identified the following non-conformities to be remedied by Signature within____days of the date written below:**

_____

_____

_____

_____

_____

_____

_____

_____
**Signature**

_____
**Printed Name**

_____
**Title**

_____
**Date**

## EXHIBIT M
## INSURANCE REQUIREMENTS

Buyer and Signature shall secure and maintain the following Insurance: (i) for the duration of this Agreement such insurance as will protect each party from claims under the Worker's Compensation Statute for the state in which the work is performed and from such claims for bodily injury, death or property damage as may arise in the performance of their services under this Agreement in amounts equal or greater than the minimum limits set forth below, (ii) for the duration of this Agreement and for two (2) years following completion of all Work under this Agreement such insurance as will protect each party from claims for bodily injury and property damage in amounts equal or greater than the minimum limits set forth below, and (iii) for the duration of this Agreement automobile liability insurance in amounts equal or greater than the minimum limits set forth below. Notwithstanding anything to the contrary contained in this Agreement, a party's obligations to carry the insurance provided herein may be satisfied by a combination of a primary policy and any number of umbrella/excess policies of insurance.

Prior to commencing the Work, Buyer and Signature shall deliver to each other insurance certificates evidencing the coverage specified below. Signature shall not provide work or service for the Buyer until properly completed original certificates of insurance have been received and approved by Buyer or the proper parties. Both parties further agree to carry higher limits as required and defined by this Agreement and shall require the same coverage (including Additional insured and Waiver of Subrogation requirements) from any subcontractor whom they hire to work on the Project.

GENERAL LIABILITY INSURANCE -OCCURANCE FORM
Commercial General Liability Insurance must be carried with at least the following limits of liability:

General Aggregate $2,000,000 Products -Completed Operations Aggregate $2,000,000

| | |
|---|---|
| Personal & Advertising Injury | $ 1,000,000 |
| Each Occurrence | $ 1,000,000 |
| Fire Damage Legal Liability | $ 50,000 |

**WORKERS' COMPENSATION INSURANCE**
Workers' Compensation and Employer's Liability Insurance as required by applicable State Law for all of Signature's and Buyer's (including but not limited to Owner and/or General Contractor's) employees. Waivers of Subrogation are required as outlined in this Agreement. The following minimum limits are required:

Workers' Compensation Coverage Statutory Coverage as required by the State in (Coverage A) which the job is located.

Employer's Liability Coverage (Coverage B) $1,000,000
$1,000,000   Disease -Each Employee

Business Auto Policies are required to have coverage for "Any Auto" or "Owned, Non- Owned and Hired Automobile" with the following minimum limits of liability:

Bodily Injury and Property $1,000,000 each accident Damage; including Combined Single Limit Owned, Hired and Non-Owned Autos.

**UMBRELLA LIABILITY INSURANCE**
Umbrella Liability Insurance must be carried with at least the following minimum limits of liability:
Umbrella/Excess $1,000.000 Each Occurrence   $2,000,000.00 aggregate

**BUILDERS RISK**
Builders' Risk Insurance will be obtained by the Buyer. Signature shall be named as an Insured on the policy and a loss payee as its interests may appear.

**ADDITIONAL INSURED**
All liability policies shall be written so as to provide that the policy providing coverage as an additional insured is primary and not contributing with the coverage which the other party may carry. Each liability policy carried by a party shall provide that the other party is named as an additional insured there under to the extent of the other party's work. Buyers lender, Leader Bank, shall be named as an additional insured in all policies.

**WAIVER OF SUBROGATION**
All policies required herein shall provide, to the fullest extent permitted by law, Waiver of Subrogation rights in favor of all parties required to be named as Additional insured. The Waiver of Subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of Indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property.

**NOTICE OF CANCELLATION OR MATERIAL CHANGE**
The insurance certificates shall provide that each party shall provide the other with thirty (30) days prior written notice in advance of any cancellation or non-renewal of any of the coverages required hereunder.

**SUBCONTRACTORS**
Signature shall provide buyer with insurance certificates for all subcontractors (including the crane operator) that will work on the set of the boxes on the project site prior to the commencement of the set. The insurance for the subcontractors shall have all of the limits contained in this agreement and include Buyer and buyer's lender as additional named insured.

**CERTIFICATES OF INSURANCE**
Each party shall furnish the other party with an Original ACORD form certificate of insurance on forms provided by the respective party's Insurance Carrier to show that the above insurance is in force. The form must state policy numbers, dates of expiration, limits of liability and coverages thereunder, the name of the project, or "Any and All Operations" if the parties are working together on more than one project.

As often as any policy shall expire or terminate, renewal or replacement policies shall be procured and maintained by the party responsible for such policy. In the event that either party fails, within ten (10) days after written notice of demand therefore, to supply evidence that the insurance required to

be obtained by it, pursuant to the requirements hereto, has been obtained or has been kept current, the other party may (but shall not be obligated to) obtain and pay for such insurance and receive reimbursement therefore from the other party upon demand.

Maintenance of the foregoing insurance coverage shall in no way be interpreted as relieving either party of any responsibility beyond the required limits of insurance. Either party may secure, at that party's own expense, such additional insurance as that party deems necessary.

**SPECIAL PROVISIONS**
Insurance coverage carried by either party shall not be subject to limitations, conditions or restrictions deemed inconsistent with the intent of these Insurance Requirements.

All policies are to be written through companies duly entered and authorized to transact that class of insurance in the state in which the job is located. The Insurance Companies must have an A.M. Best rating of A-, VII or better in the most recent Best's Key Rating Guide.

**EXHIBIT N**
**PREVAILING WAGE RATES**

THIS JOB IS NOT PREVAILING WAGE OR UNION RATE.

# EXHIBIT "5"

# Gordon E. Meyer & Associates, P.C.

**Attorneys at Law**
8 Winchester Street
Boston, Massachusetts 02116-5424
------------
Telephone (617) 482-2377 • Facsimile  (617) 482-0629
E-mail: general@gmeyerlaw.com

Gordon E. Meyer
Michael P. Carlson
Andrew E. Bensson
Daniel F. O'Shea*

**RECEIVED** MAY 0 1 2017

*Also admitted to practice in
Rhode Island*

April 25, 2017

<u>**VIA FACSIMILE:**</u> 570-774-1010
<u>**EMAIL:**</u>  vicd@sbsmod.com
<u>**CERTIFIED MAIL, RETURN RECEIPT REQUESTED**</u>

Victor A DePhillips, President
Signature Building Systems of PA, LLC
1004 Springbrook Avenue
Moosic, PA 18507

Re:  3383 Washington Street, Boston, Massachusetts
      Partners 3190 LLC v. Signature Building Systems of PA, LLC
      Our File No. M05640

Dear Mr. DePhillips,

This office represents Partners 3190 LLC, 3383 Holding LLC, and JP Washington Construction LLC. Pursuant to Section 23 of the June 24, 2016 Agreement ("Contract", without Exhibits, Exhibit 1) between Partners 3190 LLC, as Buyer, and Signature Building Systems of PA, LLC ("Signature"), as Seller, Partners 3190 LLC, and its successors, 3383 Holding LLC and JP Washington LLC ("Partners") respectfully  demands arbitration against Signature before the American Arbitration Association Commercial Section in Boston, Massachusetts.

In the arbitration, Partners seeks to be indemnified and made whole from all damages, costs, expenses, including but not limited to costs of remediation including labor and materials, diminution in value, lost rent, expert fees and attorney fees, resulting from Signature's use of Propylene Glycol ("PG") in the Chlorinated Polyvinyl Chloride ("CPVC") in the "FlameGuard®" fire suppression system in all 21 modular units that Signature built, manufactured, sold, delivered and installed at 3383 Washington Street, Boston, Massachusetts.

The use of PG is expressly not recommended by the manufacturer of the system, Spears Manufacturing Company ("Spears") and can cause cracking within the system, creating life

Victor A DePhillips, President
Signature Building Systems of PA, LLC
April 25, 2017
Page 2

safety risks, and it voids and nullifies all warranties. Signature, not Partners, chose, obtained, installed and provided the system from Spears. According to Spears,

### "GLYCOL EFFECTS ON CPVC FLAMEGUARD® PRODUCTS"

*Spears® Manufacturing Company does not recommend the use of FlameGuard® Chlorinated Polynivly Chloride (CPVC) with any glycol-based anti-freeze solutions (e.g.: Ethylene and Propylene Glycol).*

*Once a Glycol based antifreeze has been introduced into a FlameGuard® CPVC system, all warranties are null and void. Extensive testing has confirmed that Glycol based antifreeze can cause Environmental Stress Cracking (ESC) within the system. Spears® Manufacturing Company does not currently know of any process or procedure that will adequately clean a FlameGuard® CPVC system once glycol-based anti-freeze has been introduced into that system.*

*It is the position of Spears® Manufacturing Company that removal and replacement of any contaminated system take place in order to forego any possible future performance issues that may occur resulting from the introduction of a glycol-based anti-freeze into a CPVC system."*
(January 2017 Compliance Certificate of Alan Lunt, President of Spears, Exhibit 2)

According to Alan Lunt, all Signature employees were trained by Spears staff using an instruction booklet, which at page 16 indicates:

*"WARNING: DO NOT use glycol-based antifreeze solutions. Glycol solutions are not chemically compatible with the CPVC material and can cause damage to the CPVC Fire Sprinkler System."*
(April 3, 2017 email of Alan Lunt to Victor DePhillips, Exhibit 3)

Signature admits using 20% PG in the system. (See attached March 30, 2017-April 11, 2017 emails between Victor DePhillips and Alan Lunt, Exhibit 4)  This is a breach of the Contract by Signature, which, among other things, requires the Units be free of defects, and built in a good and workmanlike manner (Exhibit 1, s. 1(a)). Signature is thus responsible for all damages, costs, losses, and attorney fees. The Contract provides, in pertinent part:

*"21. INDEMNITY.*
*To the fullest extent permitted by law, Signature shall indemnify, defend and hold the Buyer and its agents and employees harmless (collectively "Indemnify") from and against any and all third party claims, losses, costs, damages,*

Victor A DePhillips, President
Signature Building Systems of PA, LLC
April 25, 2017
Page 3

> *liabilities, fines and penalties, demands and causes of action, including, but not limited to, attorneys' fees (hereinafter "Claims"), to the extent arising out of the negligent performance or non-performance of Signature's Work or material, or work of materials, or those for whom Signature is legally responsible, or Signature's breach of any of its obligations under this Agreement. . . . This indemnification provision does not negate, abridge, or reduce any other rights or obligations of the persons and entities described herein that they would have absent this indemnification provision. This Indemnification obligation is not limited in any way by Signature's insurance coverage. Signature will defend all such indemnified claims at its own cost and expense. In claims against any person or entity indemnified under this Section by an employee of Signature, the indemnification obligation under this Section shall not be limited by a limitation on amount or type of damages, compensation, or benefits payable by or for Signature under workers' or workmen's compensation acts, disability benefit acts, or other employee benefit acts. This provision shall survive the Substantial Completion of the Work, Final Completion of the Work and termination of this Agreement."*

The units cannot be occupied, and Certificates of Occupancy cannot be obtained, due to the use of the PG. The fire suppression contractor, Rescom Fire Protection, Inc. cannot sign off on the Permit, due to the use of the PG. The City of Boston will not issue a Certificate of Occupancy without this.

The present CPVC pipes are concealed in the walls and ceilings, and are not visible. As the manufacturer, Spears, requires the system be abandoned once PG has been used, based on a preliminary analysis, the remediation options appear to be: 1) cutting open all necessary existing walls and ceilings, removing all contaminated CVPC pipes, reinstalling CVPC piping in which PG has not been used, and replacing/repairing all walls and ceilings or 2) keeping the existing CVPC pipes in place but not using them, installing new CVPC pipes outside the walls, and building frames in the 21 units to cover the new CVPC pipes, which would diminish the value of the units, as the CVPC pipes would no longer be concealed within the walls.

We do not have a Preliminary estimate for Option 1 above as the scope of the work is very large and unclear. It would involve extensive demolition of substantial areas of the ceilings, cutting out existing pipes, installing new pipes, (many twists and turns), patching ceilings, priming, and other work.

For Option 2 above, the Preliminary estimate by Rescom to reinstall all piping at all 21 Units is approximately $136,000.00 plus $104,500.00 for the General Contractor work in all Units for the soffit, drywall, design, drawings, amending permits and otherwise ($240,500.00 total).

Victor A DePhillips, President
Signature Building Systems of PA, LLC
April 25, 2017
Page 4

The information herein is based on a preliminary evaluation only and is subject to change.
Partners has not completed the evaluation as to the claims and extent of the damage and losses
resulting from Signature's conduct, and reserves the right to supplement all aspects of this
Demand including adding other common law and statutory claims.  An expedited arbitration will
be requested as the delay in renting the units will result in extensive additional damages,
including loss of rent.

Please also allow this to stand as Notice  i) pursuant to Section 11 of the Contract that all 21
Units are rejected as defective and ii) of a breach of warranty pursuant to Section 16 of the
Contract.

We respectfully request names and contact information for the buyers of those 4-5 systems with
GP in the past few years that you indicate in your April 11, 2017 email to Alan Lunt (Exhibit 5)
were tested.

Please advise in writing by no later than 5:00 pm Tuesday, May 2, 2017 if Signature agrees to
Arbitration of this dispute. I am available to discuss this matter.

Very truly yours,

Gordon E. Meyer

GEM/kc
Enclosures
cc:  Alan Lunt, Spears Manufacturing Company (via email: alunt@spearsmfg.net w/enc.)

# EXHIBIT "6"

# Mey & Sulla, L.L.P.

**Attorneys - at - Law**
**1144 East Drinker Street**
**Dunmore, PA  18512**
**570-961-1929**
**570-344-6322**
**Fax No. 570-961-5908**
**mmey@meysullalaw.com**
**jsulla@meysullalaw.com**

**Please reply to Dunmore**

---

**Michael R. Mey**                                                    **1425 Wyoming Avenue**
**Justin J. Sulla**                                                      **Forty Fort, PA  18704**

May 19, 2017

via email:mcarlson@gmeyerlaw.com

Gordon E. Meyer, Esquire
Gordon E. Meyer, P.C.
8 Winchester Street
Boston, MA 02116-5424

     **RE:**   **Signature Building Systems/Partners 3190 LLC**

Dear Mr. Meyer:

     I have had an opportunity to review both your letter of April 25, 2017 and your demand for Arbitration with AAA.

     Kindly accept this as a response to your letter of April 25th,  specifically page 4 where notice is made pursuant to Section 16 of the Contract for a Breach of Warranty.

     Signature accepts this Notice and will submit the same to PFS for their evaluation.  Accordingly, I request your consent to stay or dismiss the AAA Arbitration. If you are unwilling to do so, I will make the necessary filing with AAA seeking a stay or dismissal for enforcement of Paragraph 16(e) of the contract.

     If you are unwilling to honor this provision of the contract, please advise immediately.  If I do not hear from you or obtain your consent I will file the necessary action in order to enforce the terms of the contract.

                   Yours truly,

                   Michael R. Mey, Esquire

MRM/jmn
cc:    Victor DePhilips